# CHARLESTON.

## SALT COMPANY v. BROWN.

### February 25, 1874.

An incorporated company, being the owner of coal lands, desires to obtain a subterranean right of way through or under the lands of another person, for the purpose of mining, and removing its own coal and applies to court for the benefit of the forty-fourth and forty-fifth sections of chapter forty-three of the Code.

The report of the commissioners and the evidence in the case, show that the company is the owner of some thirty acres of coal land, from which the coal could not be mined and transported without going through the land of the defendants; that the company use said coal for the purpose of manufacturing salt at their furnaces, and to sell to the people living in and about the town of Hartford City; that the people living in and about said town could obtain coal, also, from other sources and that the public would not use the subterranean way set out and described in the commissioners' report, through the land of the company, but the company only.— HELD:

That the report and evidence do not show that the purpose for which the property is to be taken is of such public utility as that said report should be confirmed by the court, under the forty-fifth section of said forty-third chapter of the Code.*

---

*The following are the sections referred to in the syllabus and opinion of the Court:

*Right of way, etc., to timber and mineral lands.*

"44. Any person owning land having timber upon it or containing coal, ore, or other minerals, who desires to obtain a subterranean or surface right of way, by railroad or otherwise, under, through, or over land belonging to another, or over any railroad, canal, state or county road, for the purpose of mining for such minerals, or conveying such timber or minerals to market, or for the purpose of draining any coal or mineral lands under, through, or over lands belonging to another, or who desires to obtain land on or near a railroad, or navigable stream, or public road, for a place of deposit, sale, and shipment of such timber or minerals, may make application therefor, pursuant to the forty-sec-

1874.
January Term.

Salt Company
v.
Brown.

This was an appeal from the judgment of the circuit. court of Mason county, rendered on the 28th day of May, 1872, in a certain suit therein pending, wherein the Valley City Salt Company was plaintiff and Major Brown, Isaac Green and Mahala his wife, Joseph Hereford and Susannah his wife, Lydia Pumphrey, Virginia Pumphrey, Ella Pumphrey, Alice C. Pumphrey, ——— Ross and Cassandia his wife, Bazelel J. Pumphrey and Ann his wife, George W. Pumphrey in his own right and as executor of Nimrod Pumphrey and as trustee of Adaline Agnew, and Jane, wife of said George W. Pumphrey, Perry C. Purnell and Mary Ellen his wife, Daniel Polsley as executor of Nimrod Pumphrey and as trustee of Adaline Agnew, and Adaline Agnew, were defendants. The appeal was taken by Major Brown, one of the defendants.

The Hon. James W. Hoge, judge of the circuit court of said county, presided at the trial below.

The facts in the case, together with the constitutional provisions referred to, are sufficiently set forth in the opinion of Paull, Judge.

---

ond chapter, to the circuit court of the county, and the proceedings. thereon had shall conform to the said chapter."

"45. The report of the commissioners appointed pursuant to the said forty-second chapter to ascertain the just compensation to be paid for the property to be taken or injured for the purpose mentioned in the peeceding section shall not be confirmed and ordered to be recorded by the court, unless from such report and the evidence in the case the court is of the opinion that the purpose for which the property is to be taken is of public utility, nor then, if it appear that the mansion house of any person, or the yard, garden or orchard pertaining thereto, or any mill, warehouse, factory, store or shop, railroad, canal, state or county road will be materially injured; and upon payment of the compensation so ascertained, within the time and the manner prescribed by the eighteenth section of the said chapter, a right of way only shall be vested in the applicant, not to exceed fifty feet wide in any case, except as to the land condemned for such place of deposit, sale and shipment (which shall in no case exceed one acre), as to which the title shall be absolutely vested in the applicant upon such payment. When the right is so vested in the applicant to cross any railroad, canal, state, county, or other road, he shall at his own expense, make and arrange the said crossing so as not to interrupt, or in any wise interfere with, the free use of such railroad, canal, state, connty, or other road.

*Edward B. Knight* and *William H. Tomlinson*, for the appellant.

*J. W. English*, for the appellee.

PAULL, JUDGE:

The Valley City Salt Company, the appellee and plaintiff below in this proceeding, is a corporation, organized under the laws of this State, for the purpose of digging or boring for salt and other minerals, and manufacturing the same; and also for mining coal and marketing the same; and for selling goods, having its principal office or place of business at Hartford City, in Mason county, West Virginia. The said company being the owner of a certain tract of land, containing thirty acres, and desiring to obtain access thereto by a subterranean right of way, by railroad, under a portion of an intervening tract, sought the benefit of the forty-fourth and forty-fifth sections of chapter forty-three of the Code of West Virginia. A petition was addressed to the circuit court of Mason county, setting forth the fact of ownership, and asking that commissioners might be appointed to ascertain what would be a just compensation to the owners of the land for what was sought to be taken in accordance with the provisions of law. The petition recites that the said right of way was "sought to be established by said company in order that it may mine and remove the coal from said tract of land, marked D., for the purpose of marketing the same, and of supplying the salt furnace of said company with coal, and for draining the rooms and entries which may be made in said lot D." To this petition Major Brown demurred; commissioners were appointed, and made their report, to which the defendant Brown filed exceptions; but the same were overruled by the court, and the report directed to be recorded on the chancery side of the court, the judge being satisfied that the purpose for which the property, in the petition mentioned, is to be taken, is of public util-

ity; and it not appearing that the mansion house of any person, or the yard, garden or orchard pertaining thereto, or any mill, warehouse, factory, store, or shop, railroad, canal, State or county road will be materially injured by the taking of said property for said subterranean right of way.

Two of the exceptions, (the first and fifth) made to the report present the chief question raised by these proceedings for the consideration of the court, to-wit: Whether the applicants, the appellees here, are justified in invoking the right of eminent domain, residing in the State, for the accomplishment of their object. And to this question our attention will now be directed. The former Constitution of this State under which this cause originated, provided, as probably do the Constitutions of all the States of this Union, in article two section six, that "private property shall not be taken for public use without just compensation:" And that "no person, in time of peace, shall be deprived of life, liberty or property without due process of law." These provisions have been invoked by the defendant for his protection or the protection of his property. We observe in the outset that private property is there held subject to "publice use" according to this provision of our civil compact, wherever the Legislature of the State in the exercise of its wisdom, shall see proper to wield the high and sovereign power of the government for this purpose. We observe, in the second place, that this constitutional limitation impliedly prohibits the taking of private property for any private use whatever, without the consent of the owner. This last proposition has been long supported in the legislative and judicial history of the country by the weight of authorities; but this question does not arise in the present case and is not intended to be decided at this time.

The remaining and material question then is, whether the land which has been taken, by the

proceedings in the present case is taken for

*public use*, as that use is found to appear in accordance with established legal principles; if so, the proceedings, (if there be no formal objection to them) are valid and if such use is not found to appear, they are void. We remark here, that the words "public utility" occurring in the forty-fifth section, must be regarded as synonymous, with the words "public use." We do not suppose that any different meaning was intended by the Legislature, but if there was, and there is really any difference in the signification, that attached to the language in the higher law, must prevail.

What then constitutes a public use, as contradistinguished from private use? The most extended research will not likely result in the discovery of any rule, or set of rules or principles, of certain and unusual application, by which this question can be determined in all cases. Eminent jurists and distinguished writers upon public law, do not express concurrent or uniform views upon this subject. It is a question, from its very nature, of great practical, perhaps of insuperable difficulty, to determine the degree of necessity, or the extent of public use, which justifies the exercise of this extraordinary power upon the part of a State, by which the citizen, without his will, is deprived of his property. For example; says Chancellor Walworth, in the case of *Beekman v. Saratoga and Schenectady Railroad Company*, in speaking of the *public interest*, "But if the public interest can be in any way promoted by the taking of private property, it must rest in the wisdom of the Legislature to determine whether the benefit to the public, will be of sufficient importance to render it expedient for them to exercise the right of eminent domain, and to authorize an interference with the private rights of individuals, for that purpose." An eminent commentator, judge Cooley, referring to this language, says, "It would not be entirely safe, however, to apply with much liberality, the language above quoted, that, 'when the public in-

1874.
January Term.

Salt Company
v.
Brown.

terest can be, in any way, promoted by the taking of private property,' the taking can be considered for a public use. It is certain that there are very many cases, in which the property of some individual owners would likely be better employed, or occupied, to the advancement of the public interest, in other hands, than in their own; but it does not follow from this circumstance alone, that they may rightfully be dispossessed:" And then follow some forcible and pertinent illustrations. chief j. Bigelow, in *Talbot v. Hudson,* 24 Monthly Law Reporter, says, "If land be taken for a fort, canal, or highway, it would clearly fall within the first class, (public use). If it was transferred from one person to another, or to several persons, for their own peculiar benefit or advantage, it would clearly come within the second class, (private use). There is no fixed rule, or standard, by which such cases can be tried and determined. Each must depend on its own peculiar circumstances." This, so far as our investigation has gone, is literally true, public writers, and the reported cases of numbers of the States furnishing us with no one certain and absolute standard of judgment. Says justice McCurdy, in delivering the opinion of the Supreme Court of Connecticut, "one of the most common meanings of the word use, as defined by Webster, is 'usefulness utility, advantage, productive of benefit.' Public use may, therefore, well mean public usefulness, utility or advantage, or what is productive of general benefit; so that any appropriating of private property by the State, under its right of eminent domain, for purposes of great advantage to the community, is a taking for public use." While this is in one sense true, it is yet perfectly obvious, that if the principle there announced is acted upon, without a most careful and guarded reference to the nature, necessity and extent of the use for which private property is sought to be taken, the great constitutional safeguard which has been thrown around it, will be utterly subverted.

1874.
January Term.

Salt Company
v.
Brown.

It may now be further observed that it is not the nature of the agents or agencies which the state may employ for accomplishing a public use that determines, in any degree, its exercise of the right of eminent domain. These may be, either natural persons, or public or private corporations, organized for their own exclusive profit and emolument, *provided* there is connected with them a *public use* of such necessity or extent as will properly justify the interference of the state's sovereign power on their behalf. A railroad company, as well as any other, illustrates this truth, being simply a private corporation seeking the pecuniary benefit of its stockholders, while, nevertheless, vastly promoting the public interests, in the facilities afforded to the public for travel and transportation. Indeed the tendencies of our present organized form of society is to accomplish benefits and secure the public good, as far as practicable, through the means of private enterprize, activity and thrift; and this is seen in the provisions of our Code, now under consideration. The uniform history of the States, as connected with the exercise of this attribute of sovereignty, shows that it cannot be limited as to the agencies employed, either as to their nature, or the private purposes for which they are called into being. These agencies, whether corporate or otherwise, must have twofold interests, both private and public; while the former alone may be regarded so far as the agency or corporation itself is concerned, yet when it is sought to clothe it with the right of eminent domain, the latter only can be regarded; here a direct purpose to benefit the public must be made to appear; and this in some direct and satisfactory form. It is manifest that not all agencies or corporations, though having a general tendency to promote the public interests, can invoke the exercise of this power of the state. For example, as long as the public must and will travel, hotels for its accommodation are useful, indeed essential and indispensible; so also printing or publishing companies, stage lines and other

forms of industry are essential to the public good, but it will not be claimed that they are entitled, merely on that account, to the aid of the state, in the manner indicated. Again, it has been most strenuously argued that the term *public use* must be confined to its simple sense of *direct* possession, occupation and enjoyment by the public : but this principle, again, if inflexibly enforced, would, in many instances, probably defeat the most salutary exercise of the power.

In looking at the history of the states upon this subject, we find that the following objects embrace about all, perhaps every one, in whose behalf the states have interposed their sovereign power ; to-wit: Public highways, turnpike roads, canals and railroads ; also, for the purpose of erecting wharves, basins, streets and alleys ; of establishing ferries, draining swamps and marshes: of bringing water to cities and villages ; of erecting dams for the improvement of navigable streams, and the creation and protection of flouring mills. The legislation of other states has embraced these objects, and we think these only, so far as we have seen, down to the present time. While this course of legislation does not furnish an absolute law of exclusion at all, it does indicate that the enlightened judgment and wisdom of our legislative bodies has found no other objects of sufficient importance· or necessity, to justify the exercise of this high power on the part of the states. In this connection we refer to· an observation made by judge Cooley in his work on Con. Lim. 532: "The reason of the case, and the settled practice of free governments must be our guides in determining what is, or is not to be regarded a public use ; and that only can be considered such where the government is supplying its own needs, or is furnishing facilities for its citizens in regard to those matters of public necessity, convenience or welfare, which, on account of their peculiar character, and the difficulty—perhaps impossibility—of making provision for them, otherwise, it is alike proper, useful and needful for the government to·

1874.
January Term.

Salt Company
v.
Brown.

provide." In looking at the class of objects above enumerated, we find that they are all of an undoubted, needful character; in other words there is connected with them all a clear *public use*; this element is indispensable: again, we find that in regard to them all, the government still maintains its power, and can so regulate and control the action of the agencies by which they are managed as to secure the rights and interests of the public therein; and if to these we shall add the impossibility or extreme difficulty, at least, of effectuating the same purposes in any other way, we may, perhaps, find in the combination of these three elements, a rule particular safe for our guidance in determining in any particular case, whether there has been a constitutional exercise of the right of eminent domain.

Before applying this rule to the case in hand, we refer again to said forty-fourth and forty-fifth sections of our Code: it will be observed that the right given in the forty-fourth section to certain parties to call in the aid of the State, is not absolute, but modified and controlled by the forty-fifth section, making it the express duty of the court to determine whether the purpose, in any particular application which is made, for which the property is to be taken, is of public utility or use; if not, all the proceedings must be rejected. It is not necessary, therefore, to pass here upon the constitutional character of the forty-fourth section, but simply to determine whether, under all the circumstances of this case, as seen in the report and evidence, a public use is legally found to appear; this it is made the express duty of the courts to determine in each case as it may arise.

In looking at the proceedings in this case, we find no light or information upon this point, in the report of the commissioners; the evidence introduces the certificate of incorporation, which recites the purposes of its organization, which have been hereinbefore set forth, to-wit: of digging and boring for salt, and other minerals, and making the same, and also for mining coal and market-

ing the same; and also for selling goods: the evidence further recites that the applicants were to sell their coal to the people living in and about the town of Hartford City, in Mason county; but at the same time, that said people could obtain their coal from other sources; that the public would not use the subterranean right of way, but the applicants only.

We are unable to see in this evidence and report of commissioners any of the requisitions of the rule: the work is not even needed to supply a limited neighborhood with coal; they can otherwise obtain their supplies; it is not extremely difficult, much less impossible, to do so; and there is no remaining supervision of law to regulate or secure any possible public interests. No sufficient public use is therefore made to appear to justify an interference with the rights of private property. To secure the possession and enjoyment of private property is one of the chief ends of all free governments; and hence the limitation found in our National and State Constitutions to secure this object and the safeguard thus provided in the supreme law, may not be lightly or recklessly invaded. To destroy or materially weaken its force, would be to subvert one of the pillars on which rests the fabric of our civil society. While cheerfully conceding that private interests must yield to the public exigencies, or the public good, in a proper case, yet that proper case must be clearly made to appear. Said a learned jurist of Virginia, judge Green, in 6 Randolph, "Liberty itself consists essentially, as well in the security of private property, as of the persons of individuals; and this security of private property is one of the primary objects of civil government, which our ancestors in passing our Constitution intended to secure to themselves and their posterity, effectually and forever."

An eminent statesman of England, referring to the security of the subject under the *Ægis* of English law, once said: "There stands the poor man's cottage; the

rains of summer and the snows of winter may enter its crevices, but the King of England with all his forces, dare not enter that poor man's cottage."

1874. January Term.

Salt Company, v. Brown.

In our own country the citizen should be equally safe in his person and property under the shield of our constitutions, and the acknowledged pre-eminent dominion of the state never needlessly employed to interfere with the private rights of the highest or the lowest in the land.

The judgment or order of the circuit court of Mason county, made on the 28th day of May, 1872, confirming the report of the commissioners and ordering it to be recorded, is set aside and reversed with costs to the appellant, and this Court proceeding to render such judgment as the court below ought to have rendered, doth adjudge and order that the petition of the appellee be and the same is hereby dismissed, with costs in the circuit court, and that this order be certified to the circuit court of Mason county.

The other Judges concurred.

JUDGMENT REVERSED AND PROCEEDING DISMISSED.