# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

## September 2016 Term

No. 15-0919

FILED

**November 15, 2016**

released at 3:00 p.m.
RORY L. PERRY, II CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

### MOUNTAIN VALLEY PIPELINE, LLC,
Defendant Below, Petitioner

### V.

### BRIAN C. MCCURDY AND DORIS W. MCCURDY,
Plaintiffs Below, Respondents

---

**Appeal from the Circuit Court of Monroe County
Honorable Robert A. Irons, Judge
Civil Action No. 15-C-19
AFFIRMED**

---

Submitted: October 11, 2016
Filed:  November 15, 2016

Charles S. Piccirillo
K. Brian Adkins
Shaffer & Shaffer, PLLC
Madison, West Virginia
Attorneys for Petitioner

Derek O. Teaney
Appalachian Mountain Advocates, Inc.
Lewisburg, West Virginia
Attorney for Respondents

**JUSTICE DAVIS delivered the Opinion of the Court.**

**CHIEF JUSTICE KETCHUM dissents and reserves the right to file a dissenting opinion.**

**JUSTICE LOUGHRY concurs and reserves the right to file a concurring opinion.**

# SYLLABUS BY THE COURT

1.      Pursuant to W. Va. Code § 54-1-3 (1923) (Repl. Vol. 2016), a company may enter private land it desires to appropriate for the purpose of surveying said property only when that company is invested with the power of eminent domain.

2.      Under W. Va. Code § 54-1-1 (1931) (Repl. Vol. 2016), a company is invested with the power of eminent domain only when:  (1) it is organized under the laws of, or is authorized to transact business in, West Virginia, and (2) the purpose for which said company desires to appropriate land is *for a public use* as authorized by W. Va. Code § 54-1-2 (2006) (Repl. Vol. 2016).

**Davis, Justice:**

In this appeal, petitioner and defendant below, Mountain Valley Pipeline, LLC ("MVP"), challenges an order entered by the Circuit Court of Monroe County that granted declaratory judgment to Bryan and Doris McCurdy ("the McCurdys"), respondents and plaintiffs below, declaring that MVP has no right to enter their property to survey the area as a potential location for a natural gas pipeline MVP plans to construct. The circuit court based its decision on its finding that MVP's pipeline is not being constructed for a public use in West Virginia. In addition, the circuit court granted the McCurdys both a preliminary and a permanent injunction prohibiting MVP from entering their property. After considering the parties' briefs and oral arguments, as well as the relevant law, we find no error. Therefore, we affirm the rulings of the Circuit Court of Monroe County.

## I.

## FACTUAL AND PROCEDURAL HISTORY

MVP[1] is in the process of seeking approval from the Federal Energy Regulatory Commission ("FERC") to construct and operate a nearly 300-mile natural gas transmission pipeline from Wetzel County, West Virginia, to Pittsylvania County, Virginia.

---

[1]The record indicates that MVP is a Delaware company registered with the West Virginia Secretary of State to Conduct business in West Virginia. MVP's principal office is in Pittsburgh, Pennsylvania. According to the circuit court, MVP is a joint venture between affiliates of EQT Corporation, NextEra Energy, Inc., WGL Holdings, Inc., Vega Energy Partners, Ltd., EQT Midstream Partners, LP, and NextEra US Gas Assets, LLC.

1

MVP is a pipeline company that will not directly own the gas to be transported. However, nearly ninety-five percent of the gas to be transported is owned by affiliates of MVP.[2]

The proposed pipeline, known as the Mountain Valley Pipeline ("MVP's pipeline"), will serve the primary purpose of moving gas from the producing regions of northern West Virginia to markets in the Mid-Atlantic and Southeast regions of the United States. MVP asserts that nearly all of the gas to be transported in MVP's pipeline will be produced in West Virginia, and further contends that MVP's pipeline will provide needed capacity for additional development of natural gas in West Virginia. MVP's pipeline currently has two main delivery points: The Transco pool in Pittsylvania County, Virginia, which serves the entire east coast; and the Columbia WB pipeline, which, similar to MVP's pipeline, is a natural gas transportation pipeline. An agreement has been reached whereby MVP's pipeline will deliver gas to Roanoke Gas Company, a local distribution company that serves consumers in Virginia. However, no agreements have been reached that would provide gas to any consumers in West Virginia. Although MVP avers that such agreements are likely, there is no absolute right for local distribution companies or consumers to access MVP's pipeline, and there currently is no definitive evidence that any West Virginia consumers or non-MVP affiliated natural gas producers would benefit from MVP's pipeline.

---

[2]See note 1, *supra*, for a list of MVP affiliates.

On October 27, 2014, MVP submitted a request to FERC to initiate the pre-filing process that will lead to an application for the issuance of a certificate of public convenience and necessity for MVP's pipeline. At the time of the entry of the circuit court order herein appealed, MVP had not yet filed its formal application with FERC for a certificate of public convenience and necessity; however, MVP avers that its application has now been filed.

Respondents, plaintiffs below, Bryan and Doris McCurdy ("the McCurdys"), own approximately 185 acres of land in Monroe County, West Virginia, along the proposed route for MVP's pipeline. They have lived on a portion of their property, which consists of three tracts, since 1984. The proposed route for MVP's pipeline will cross all three of the McCurdys' tracts and, according to the circuit court, would come near to their barn and their residence.

In February 2015, the McCurdys were contacted by an MVP agent who requested access to their property to conduct surveys that are necessary to complete MVP's application process for obtaining the certificate of public convenience and necessity. The McCurdys declined to consent to the surveys. MVP then sent the McCurdys a letter, dated February 24, 2015, providing notice of MVP's intention to take legal action to obtain access

3

to the property pursuant to W. Va. Code § 54-1-3 (1923) (Repl. Vol. 2016)[3] unless the McCurdys acquiesced to the surveys by March 9, 2015.

Thereafter, on March 18, 2015, the McCurdys filed suit against MVP in the Circuit Court of Monroe County seeking a declaratory judgment that MVP has no right to enter their property for surveying purposes and further seeking both a preliminary and a permanent injunction prohibiting MVP from entering their property. MVP removed the suit to federal district court, but the federal court ultimately determined that it lacked subject matter jurisdiction because the amount in controversy was less than $75,000. Accordingly, the district court remanded the case to the Circuit Court of Monroe County for further proceedings. Following an evidentiary hearing, the circuit court, by order entered on August 19, 2015, granted declaratory judgment to the McCurdys, and also granted them preliminary and permanent injunctions. In doing so, the circuit court concluded that W. Va. Code § 54-1-3 does not authorize MVP to enter the McCurdys' property because MVP is not vested with the power of eminent domain insofar as its pipeline is not for a public use. The circuit court based its conclusion on the fact that no West Virginia consumer would use any of the gas to be transported in MVP's pipeline. The circuit court further enjoined MVP from entering the

---

[3]As will be discussed in more detail below, pursuant to W. Va. Code § 54-1-3 (1923) (Repl. Vol. 2016), "[a]ny incorporated company . . . invested with the power of eminent domain under [chapter 54], . . . may enter upon lands for the purpose of . . . surveying . . . ."

McCurdys' property under color of Chapter 54 of the West Virginia Code without the McCurdys' express permission. This appeal followed.

## II.

## STANDARD OF REVIEW

The circuit court's order herein appealed by MVP granted to the McCurdys declaratory judgment as well as preliminary and permanent injunctive relief. With respect to a declaratory judgment, this Court has held that "[a] circuit court's entry of a declaratory judgment is reviewed *de novo*." Syl. pt. 3, *Cox v. Amick*, 195 W. Va. 608, 466 S.E.2d 459 (1995).

Our review of the circuit court's grant of a preliminary injunction has three parts:

> "'In reviewing the exceptions to the findings of fact and conclusions of law supporting the granting of a temporary or preliminary injunction, we will apply a three-pronged deferential standard of review. We review the final order granting the temporary injunction and the ultimate disposition under an abuse of discretion standard, *West v. National Mines Corp.*, 168 W. Va. 578, 590, 285 S.E.2d 670, 678 (1981), we review the circuit court's underlying factual findings under a clearly erroneous standard, and we review questions of law *de novo*.' Syllabus Point 4, *Burgess v. Porterfield*, 196 W. Va. 178, 469 S.E.2d 114 (1996)." Syl. pt. 1, *State v. Imperial Marketing*, 196 W. Va. 346, 472 S.E.2d 792 (1996).

Syl. pt. 1, *Camden-Clark Mem'l Hosp. Corp. v. Turner*, 212 W. Va. 752, 575 S.E.2d 362 (2002). As to the circuit court's award of a permanent injunction, our review is for an abuse of discretion:

> Unless an absolute right to injunctive relief is conferred by statute, the power to grant or refuse or to modify, continue, or dissolve a temporary or a permanent injunction, whether preventative or mandatory in character, ordinarily rests in the sound discretion of the trial court, according to the facts and the circumstances of the particular case; and its action in the exercise of its discretion will not be disturbed on appeal in the absence of a clear showing of an abuse of such discretion.

Syl. pt. 11, *Stuart v. Lake Washington Realty Corp.*, 141 W. Va. 627, 92 S.E.2d 891 (1956).

Finally, we note that, to the extent our resolution of this appeal involves the interpretation of statutes, our review is *de novo*: "Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syl. pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995). With due regard for the foregoing standards, we proceed to our analysis of the issues raised on appeal.

## III.

## DISCUSSION

The circuit court's decision in this case was based upon its determination that MVP could only enter the McCurdys' property for a public use pursuant to W. Va. Code

6

§ 54-1-3. On appeal MVP argues that a finding of public use is not required for a mere survey, and, assuming arguendo that it is, MVP's pipeline is for a public use. We address these issues in turn.

## A. *Public Use Requirement*

This case turns on the language of W. Va. Code § 54-1-3. The circuit court reasoned that, because W. Va. Code § 54-1-3 authorizes only companies invested with the power of eminent domain to enter property against the will of the property owner, it must first be determined that MVP is invested with that power. Noting that W. Va. Code § 54-1-1 (1931) (Repl. Vol. 2016) invests the power of eminent domain in corporations such as MVP only for public use, the circuit court found that MVP could enter the McCurdys' land to conduct a survey only if MVP's pipeline is for a public use. MVP contends that surveying does not require a finding of public use. We disagree.

Pursuant to W. Va. Code § 54-1-3,

[a]ny incorporated company or body politic, *invested with the power of eminent domain under this chapter*, by its officers, servants and agents *may enter upon lands for the purpose of* examining the same, *surveying and laying out the lands*, ways and easements which *it desires to appropriate*, provided no injury be done to the owner or possessor of the land; but no company or body politic, under the authority of this section, shall throw open fences or inclosures on any land, or construct its works through or upon the same, or in anywise injure the property of the owner or possessor, without his consent, until it

7

shall have obtained the right so to do in the manner provided in this chapter.

(Emphasis added). We find no ambiguity in the relevant language above. Thus, we are obligated to apply its plain terms: "A statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect." Syl. pt. 2, *State v. Epperly*, 135 W. Va. 877, 65 S.E.2d 488 (1951). *See also Foster Found. v. Gainer*, 228 W. Va. 99, 110, 717 S.E.2d 883, 894 (2011) ("Statutes whose language is plain must be applied as written."). Under the plain language of W. Va. Code § 54-1-3, an "incorporated company" that is "*invested with the power of eminent domain under this chapter* [Chapter 54], . . . may enter upon lands for the purpose of examining the same, surveying and laying out the lands . . . ." (Emphasis added). Thus, MVP may enter upon the McCurdys' land to conduct a survey only if MVP is invested with the power of eminent domain under Chapter 54 of the West Virginia Code.

Whether an incorporated company is invested with the power of eminent domain is governed by W. Va. Code § 54-1-1 (1931) (Repl. Vol. 2016), which provides:

> The United States of America, the State of West Virginia, and every corporate body politic heretofore or hereafter created by the Constitution or statutes of the State, *and every corporation* heretofore or hereafter organized under the laws of, or *authorized to transact business in, the State, for any purpose of internal improvement for which private property may be taken or damaged for public use as authorized in section two* [§ 54-1-2] *of this article, shall have the right of eminent domain*, and may exercise the same to the extent and in the manner

8

provided in this chapter, and subject to the restrictions and limitations provided by law.

(Emphasis added). Pursuant to the plain language of W. Va. Code § 54-1-1, a corporation, such as MVP, that is authorized to transact business in West Virginia[4] "for any purpose of internal improvement for which private property may be taken or damaged *for public use*[,] . . . shall have the right of eminent domain . . . ."[5] (Emphasis added). West Virginia Code § 54-1-2 (2006) (Repl. Vol. 2016), in turn, provides in relevant part that "[t]he public uses for which private property may be taken or damaged are as follows:. . . . For constructing, maintaining and operating pipelines,. . . for transporting . . . natural gas . . . by means of pipes. . . *when for public use . . . .*" (Emphasis added).

The foregoing statutes must be strictly construed. *See State ex rel. Firestone Tire & Rubber Co. v. Ritchie*, 153 W. Va. 132, 138, 168 S.E.2d 287, 290 (1969) ("Eminent domain statutes are strictly construed." (citing *State by State Road Comm'n v. Bouchelle*, 137 W. Va. 572, 73 S.E.2d 432 (1952))). In accordance with the plain language of the foregoing provisions, we now hold that, pursuant to W. Va. Code § 54-1-3 (1923) (Repl. Vol. 2016), a company may enter private land it desires to appropriate for the purpose of

---

[4]*See* note 1, *supra*.

[5]This Court previously has determined that "[a] pipe line for transporting natural gas for the public use is an 'internal improvement' within the meaning of our constitution." *Carnegie Nat. Gas Co. v. Swiger*, 72 W. Va. 557, 567, 79 S.E. 3, 7 (1913) (citing *West Virginia Transp. Co. v. Volcanic Oil & Coal Co.*, 5 W. Va. 382, 388 (1872)).

9

surveying said property only when that company is invested with the power of eminent domain. We additionally hold that, under W. Va. Code § 54-1-1 (1931) (Repl. Vol. 2016), a company is invested with the power of eminent domain only when: (1) it is organized under the laws of, or is authorized to transact business in, West Virginia; and (2) the purpose for which said company desires to appropriate land is *for a public use* as authorized by W. Va. Code § 54-1-2.

Having determined that a public use is required for MVP to enter and survey the McCurdys' land, we next examine whether MVP's pipeline is for a public use.

### *B. Public Use*

After conducting a hearing in this matter, the circuit court applied the fixed and definite use test to conclude that MVP's pipeline was not being constructed for a public use. MVP argues that the circuit court wrongly applied the fixed and definite use test, which is based on several older cases that no longer are controlling. The McCurdys assert that the trial court did not err in concluding that MVP's pipeline is not for public use under long standing West Virginia precedent pertaining to public use.

We are cognizant that, at this point in time, MVP seeks only to survey the McCurdy land. However, as demonstrated by our analysis of the relevant statutes above, and

10

the interrelationship of those statutes, the determination of public use is the same for

purposes of entering the land for a survey and for taking the land under eminent domain.

Thus, it is of no moment that the cases discussed below address public use in the context of

eminent domain.

We begin our analysis with a review of the fixed and definite use test. The test

first was articulated in 1883 in Syllabus points 6, 7, 8, and 9, of *Varner v. Martin*:

> 6. In such a case, where the title and control of the property to be condemned is in private hands or in a corporation, three qualifications are necessary to impose upon it such a public use as will justify the taking of such private property without the consent of the owner.

> 7. The use, which the public is to have of such property, must be fixed and definite. The general public must have a right to a certain definite use of a private property on terms and for charges fixed by law; and the owner of the property must be compelled by law to permit the general public to enjoy it. It will not suffice, that the general prosperity of the community is promoted by the taking of private property from the owner and transferring its title and control to another, or to a corporation to be used by such other or by such corporation as its private property uncontrolled by law as to its use. Such supposed indirect advantage to the community is not in contemplation of law a public use.

> 8. This use of the property, which in such case the public must have, must be a substantially beneficial use, which is obviously needful for the public to have, and which it could not do without except by suffering great loss or inconvenience.

> 9. And when the title of property is thus transferred by condemnation to an individual or to a corporation, the necessity

11

> for such condemnation must be obvious. It must obviously appear from the location of the property proposed to be condemned, or from the character of the use, to which it is to be put, that the public could not, without great difficulty, obtain the use of this land or of other land, which would answer the same general purpose, unless it was condemned. And in such case, the courts will judge of the necessity for confirming such condemnation.

21 W. Va. 534 (1883). The *Varner* Court applied this test to find that construction of a road for the sole purpose of providing a private landowner with access to his private property for his own enjoyment thereof was not a public use.

The fixed and definite use test then was referred to in *Pittsburg, W. & K.R. Co. v. Benwood Iron Works*, 31 W. Va. 710, 8 S.E. 453 (1888), wherein this Court found that a railroad company's construction of a switch track between a steel plant and the railroad's main line was not a public use. The Court explained that the railroad company's

> object is to condemn the land of the defendants for the purpose of enabling it to lay a siding, switch, branch-road or lateral work from the main track to the Wheeling Steel-Works, a few hundred feet distant, for the purpose, as stated in the original petition, "of transporting freights to and from said steel-works over the petitioner's said railroad." This clearly was for the private accommodation of both the railroad and steel-works, and to make the private business of both more profitable. This was not for a public, but was for a private, use, and the taking of the property under these circumstances would be the taking of private property for private use, which is clearly prohibited.

*Benwood*, 31 W. Va. at 734, 8 S.E. at 467.

12

Subsequently, in *Charleston Natural Gas Co. v. Lowe & Butler, Trustees*, 52 W. Va. 662, 44 S.E. 410 (1901), this Court again cited the fixed and definite use test and found that supplying the City of Charleston with natural gas for the use of the city and its citizens was a public use. In this regard, the *Lowe* Court held:

> Supplying an incorporated city or town and its inhabitants with natural gas for the purposes of heating and illumination, by a corporation organized under the general laws of the State, and occupying the streets and alleys of such city or town for the purpose by means of the location therein of its pipes, connections, boxes, valves and other fixtures, under an ordinance of the city or town, is a public use, for which such company may take private property . . . upon which to locate its pipe line.

Syl. pt. 1, in part, *id.* The *Lowe* Court further held that the gas company was "bound to furnish gas to every inhabitant of such city or town who applies therefor and complies with the regulations prescribed by the ordinances of the town, or fixed by contract between the council and the company." Syl. pt. 2, in part, *id.* In reaching its conclusions, however, the *Lowe* Court discussed the difficulty of defining the concept of "public use":

> In *Salt Co. v. Brown*, 7 W. Va. 191 [(1874)], Judge Paul said: "What then constitutes a public use, as contradistinguished from a private use? The most extended research will not likely result in the discovery of any rule or set of rules or principles of certain and uniform application, by which this question can be determined in all cases. Eminent jurists and distinguished writers upon public law, do not express concurrent or uniform views upon this subject. It is a question from its very nature, of great practical, perhaps of insuperable difficulty, to determine the degree of necessity, or the extent of public use, which justifies the exercise of this extraordinary power upon the part

13

of a state, by which the citizen, without his will, is deprived of his property.["]

> What is a public use is incapable of exact definition.

*Id.* at 666-67, 44 S.E. at 411-12.

The fixed and definite use test was again applied in *Hench v. Pritt*, 62 W. Va. 270, 57 S.E. 808 (1907), wherein the Court concluded that a timbering company's construction of a private railway for use in getting its timber to market was for the company's private use and benefit, and was not for a public use:

> The petition in case at bar clearly shows that the plaintiffs are seeking to obtain this right of way in order to enable themselves to transport their timber from their land to their mill, clearly showing that it is for their private use and benefit, and in order to give it the semblance of being for public use they show that the other owners of timber along the route may be enabled also to market their timber over the same road. It in no way appears that the general public will derive any benefit from it other than the development of private property and interests. The proposed road is not to be a common carrier nor one which will be of use to the community at large, to be used by the public in general, but simply a private way for the convenience of the projectors and builders thereof for the shipment of their logs and timber to market.

62 W. Va. at 276, 57 S.E. at 810.

Finally, in *Carnegie Natural Gas Co. v. Swiger*, 72 W. Va. 557, 79 S.E. 3 (1913), the Court was asked, *inter alia*, whether a proposed pipeline was for a public use.

14

The *Swiger* Court considered earlier cases and summarized the fixed and definite use test thusly:

> (1) That the use which the public is to have of the property taken must be fixed and definite, and on terms and charges fixed by law; (2) that such public use must be a substantial beneficial one, obviously needful for the public, which it cannot do without, except by suffering great loss or inconvenience; (3) that the necessity for condemnation must be apparent and that the public need must be an imperious one.

*Id*. at 570, 79 S.E. at 9. The *Swiger* Court found the fixed and definite use test was met because Carnegie Natural Gas Co. was a public service corporation that had a duty to provide gas to individuals "along the entire line traversed;" the public would substantially benefit from the ability to use natural gas for light, heat, and power; and the rights of way sought were necessary to move the natural gas from the "source of supply to the places of consumption." *Id*. at 571-72, 79 S.E. at 9.

Observing that the most recent application of the fixed and definite use test was in 1913, MVP contends that this Court's recent decisions analyzing public use do not follow the fixed and definite use test. *See W. Va. Dep't of Transp. v. Contractor Enters., Inc*., 223 W. Va. 98, 672 S.E.2d 234 (2008) (determining construction of public highway and associated material storage waste site was public use); *Retail Designs, Inc. v. W. Va. Div. of Hwys*., 213 W. Va. 494, 583 S.E.2d 449 (2003) (finding public use in keeping access road between state highway and real property used for commercial, industrial, or mercantile

15

purpose); *Charleston Urban Renewal Auth. v. Courtland Co.*, 203 W. Va. 528, 509 S.E.2d 569 (1998) (involving city's exercise of eminent domain to acquire land owned by private company located in downtown area). In general, we find these cases are not instructive to the instant matter because they all involve condemnation by a government entity and not a private company such as MVP. However, one of the cases, *Charleston Urban Renewal Authority v. Courtland Co.*, does warrant discussion.

In *Charleston Urban Renewal Authority v. Courtland Co.*, this Court, referring to earlier cases that applied the fixed and definite use test, observed that "[t]here was a time when this Court's cases took a more narrow view of what could constitute a 'public use . . . .'" *Id.* at 536, 509 S.E.2d at 577. The Court then remarked that,

> [u]nder these narrow definitions of a "public use," the taking of land by an urban redevelopment authority like CURA [Charleston Urban Renewal Authority], as part of creating a "unified business district"– say, for sale to a hotel builder–would not be a "public use."
>
> However, this narrow view of what may constitute a "public use" has broadened over time.

*Id.* Although *Courtland* signals this Court's recognition of a broadening of the definition of "public use," it is important to note that, in West Virginia, this broadening has occurred in cases involving *government* action to combat certain *social plights*, especially where the *Legislature* has determined that government action is necessary. This fact is evident from the *Courtland* Court's observation that

16

[t]his broadening [of the definition of "public use"] was recognized in *State ex rel. City of Charleston v. Coghill*, 156 W. Va. 877, 880-81, 207 S.E.2d 113, 116 (1973), where this Court stated:

> Prior decisions of this Court have continuously enlarged the sphere of permissible *government action* in what was formerly considered exclusively the private sector. In *Chapman v. Housing Authority*, 121 W. Va. 319, 3 S.E.2d 502 (1939) this Court held valid the West Virginia Housing Act which had as its primary purpose *slum clearance*. In *State ex rel. West Virginia Housing Development Fund v. Copenhaver*, supra, [153 W. Va. 636, 171 S.E.2d 545 (1969)] this Court held constitutional Chapter 31, Article 18, Section 1 et seq. of the *Code of West Virginia*, 1931, as amended, which provided for the West Virginia Housing Development Fund. The Fund had as its purpose *an increase in the amount of housing available to West Virginia residents*. Similarly in *County Court v. Demus*, supra, [148 W. Va. 398, 135 S.E.2d 352 (1964)] this Court reviewed the Industrial Development Bond Act, Chapter 13, Article 2C, Section 1 *et seq.* of the Code of West Virginia, 1931, as amended, which permitted a county or municipality to acquire property for the purpose of leasing it for industrial purposes, and this Court again found the legislation to be without constitutional infirmities. These cases clearly establish the broad sphere of permissible *governmental activity* in areas where the Legislature determines that government action is a necessary supplement to private enterprise to *alleviate social problems*.

*Courtland*, 203 W. Va. at 536, 509 S.E.2d at 577 (emphasis added). *See also Kelo v. City of New London*, 545 U.S. 469, 477, 125 S. Ct. 2655, 2661, 162 L. Ed. 2d 439 (2005)

17

(applying a broader standard for public use in a case where the Supreme Court "granted certiorari to determine whether *a city's decision to take property for the purpose of economic development* satisfies the 'public use' requirement of the Fifth Amendment" of the United States Constitution" (emphasis added));[6] *Daniels v. Area Plan Comm'n of Allen Cty.*, 306 F.3d 445, 460 (7th Cir. 2002) (observing that "[e]ven though the Supreme Court has required the existence of a public use to justify a taking, *the burden on the state is remarkably light*," but nevertheless finding no public use where a local plan commission sought to vacate a

---

[6]Even though the *Kelo* Court applied a broad meaning to the term "public use" under the facts therein presented, the Court nevertheless expressly recognized that even a city could not take property for conferring a private benefit on a private party:

> [T]he City would no doubt be forbidden from taking petitioners' land for the purpose of conferring a private benefit on a particular private party. *See* [*Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 245, 104 S. Ct. 2321, 2331, 81 L. Ed. 2d 186 (1984)] ("A purely private taking could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void"); *Missouri Pacific R. Co. v. Nebraska*, 164 U.S. 403, [17 S. Ct. 130, 41 L. Ed. 489] (1896). Nor would the City be allowed to take property under the mere pretext of a public purpose, when its actual purpose was to bestow a private benefit. The takings before us, however, would be executed pursuant to a "carefully considered" development plan. [268 Conn. 1, 54, 843 A.2d 500, 536 (2004)]. The trial judge and all the members of the Supreme Court of Connecticut agreed that there was no evidence of an illegitimate purpose in this case. Therefore, as was true of the statute challenged in *Midkiff*, 467 U.S., at 245, [104 S. Ct. at 2331], the City's development plan was not adopted "to benefit a particular class of identifiable individuals."

*Kelo v. City of New London, Conn.*, 545 U.S. 469, 477-78, 125 S. Ct. 2655, 2661-62, 162 L. Ed. 2d 439 (2005) (footnotes omitted).

covenant and to redevelop deteriorated residential property as commercial property without express legislative authority (emphasis added)). Indeed, the *Courtland* Court clarified that

> [t]his opinion addresses only the degree of deference to be given to determinations by *public bodies like CURA* in their exercise of eminent domain. *We do not address the exercise of eminent domain by private entities* such as utilities that exercise the power of eminent domain pursuant to a legislative grant; *nor do we hold that such private entities are to be afforded the same degree of deference in their exercise of eminent domain that is afforded to eminent domain actions by public bodies.*

*Courtland*, 203 W. Va. at 537 n.6, 509 S.E.2d at 578 n.6 (emphasis added). Accordingly, *Courtland* does not counsel a broadening of the meaning of "public use" in the case *sub judice*.

MVP additionally argues that this Court has observed that condemnations of rights-of-way to provide energy have consistently been considered by this Court as serving a public use. *See Handley v. Cook*, 162 W. Va. 629, 632, 252 S.E.2d 147, 148 (1979). MVP fails to recognize, however, that implicit in the foregoing statement is that the energy is being provided *in West Virginia*, as demonstrated by the cases cited by *Handley* to support the

19

statement, which involve companies providing energy *in West Virginia*.[7]  *See Handley*, 162

W. Va. at 632 n.3, 252 S.E.2d at 148 n.3.

Nevertheless, we note that, in finding that a power company supplying power

to a single customer, a West Virginia coal mining company, was a public use, the *Handley*

Court did not expressly apply the fixed and definite use test.  The *Handley* Court reasoned

that,

> [t]he Legislature in order to make power available has
> conferred upon electric power companies the right of eminent
> domain, and has thereby necessarily imposed upon them, as
> public service corporations, the right and duty of performing a
> public service.  The condemner, Appalachian Power Company,
> *must* supply electrical service to those who desire it and are able
> to pay for it; the company cannot arbitrarily discontinue service
> or increase the rates charged; and, the company's provision of
> service is dependent upon the will of the Legislature and, in
> turn, the Public Service Commission.  Relators [land owners]

[7]*See Shepherdstown Light & Water Co. v. Lucas*, 107 W. Va. 498, 148 S.E. 847 (1929) (providing electricity to West Virginia consumers in Shepherdstown, West Virginia); *Brooke Elec. Co. v. Beall*, 96 W. Va. 637, 123 S.E. 587 (1924) (power company organized as a public utility corporation and operating as a common carrier); *West Virginia & Maryland Power Co. v. Racoon Valley Coal Co.*, 93 W. Va. 505, 117 S.E. 891 (1923) (power company providing electricity to West Virginia consumers along its lines); *Pittsburgh & West Virginia Gas Co. v. Cutright*, 83 W. Va. 42, 97 S.E. 686 (1918) (public service corporation transporting and serving public with natural gas); *Carnegie Nat. Gas Co. v. Swiger*, 72 W. Va. 557, 79 S.E. 3 (1913) (pipeline company/public service corporation providing public with natural gas); *Pittsburgh Hydro-Elec. Co. v. Liston*, 70 W. Va. 83, 73 S.E. 86 (1911) (providing electricity for public uses in West Virginia); *Charleston Nat. Gas Co. v. Lowe & Butler, Trs.*, 52 W. Va. 662, 44 S.E. 410 (1901) (supplying Charleston, West Virginia, and its inhabitants with natural gas).  Two additional cases cited in *Handley* did not find a public use.  Instead, they remanded for a new trial.  *See Brooke Elec. Co. v. Paull*, 96 W. Va. 645, 123 S.E. 590 (1924); *Brooke Elec. Co. v. Beall*, 96 W. Va. 637, 123 S.E. 587 (1924).

20

contend that service to one customer does not serve a public need; however, *it is the nature of the use rather than the number of persons served which is the paramount consideration. Waynesburg Southern R.R. Co. v. Lemley*, 154 W. Va. 728, 178 S.E.2d 833 (1971). Furthermore we find no distinction between residential and commercial users; seeking to separate the two as to which is deserving of "public use" treatment in the provision of utility services is unavailing to the relators. Appalachian Power Company makes available electrical power to all, individuals and businesses alike, and would be hard pressed to deny high voltage power to anyone along the proposed line who needed it. Undoubtedly, relators themselves are power users and would be horrified if their power service had not been forthcoming due to a recalcitrant adjacent landowner.

162 W. Va. at 632-33, 252 S.E.2d at 149 (second emphasis added). While the foregoing quote indicates that the elements of the fixed and definite use test appear to be met, the Court did not expressly apply the test. Additionally, the *Foregoing* Court, in dicta, added to the public use analysis by including consideration of the "nature of the use rather than the number of persons served." 162 W. Va. at 633, 252 S.E.2d at 149. Still, under *Foregoing*, at least one West Virginia entity must derive a significant benefit for a taking to be for a public use.

While the *Courtland* and *Handley* cases may call into question the fixed and definite use test, the continued viability of that test is a question we need not decide today. What is patently clear is that private property may not be taken for a private use. *See Gomez v. Kanawha Cty. Comm'n*, 237 W. Va. 451, ___, 787 S.E.2d 904, 912 (2016) ("Private property can constitutionally be taken by eminent domain only for a 'public' use."); *Handley*

21

*v. Cook*, 162 W. Va. 629, 632, 252 S.E.2d 147, 148 (observing that "private property cannot be taken for private use"); Syl. pt. 1, *Hench v. Pritt*, 62 W. Va. 270, 57 S.E. 808 ("Under our Constitution private property cannot be taken for private use, either with or without compensation."); *Pittsburg, W. & K.R. Co. v. Benwood Iron Works*, 31 W. Va. at 734, 8 S.E. at 467 ("[T]he taking of private property for private use. . . is clearly prohibited."); Syl. pt. 1, *Varner v. Martin*, 21 W. Va. 534 ("Under our Constitution private property can not be taken with or without compensation for private use."). *See also* W. Va. Const. art. III, § 9 (establishing how private property may be taken); *Kelo v. City of New London,* 545 U.S. at 477-78, 125 S. Ct. at 2661-62, 162 L. Ed. 2d 439 ("'A purely private taking could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void.'" (quoting *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 245, 104 S. Ct. 2321, 2331, 81 L. Ed. 2d 186)).

MVP has been unable to identify even a single West Virginia consumer, or a West Virginia natural gas producer who is not affiliated with MVP, who will derive a benefit from MVP's pipeline. As noted above, the circuit court expressly found that MVP "is not regulated as a utility by any West Virginia agency."[8] MVP is a private company seeking to

---

[8]Because MVP is a private company, its efforts to use eminent domain are subject to greater scrutiny than that of a government entity. *See, e.g.*, *Texas Rice Land Partners, Ltd. v. Denbury Green Pipeline-Texas, LLC*, 363 S.W.3d 192, 197 (Tex. 2012) ("While [statutory] provisions plainly give private pipeline companies the power of eminent domain, *that authority is subject to special scrutiny by the courts*."). *Cf.* 2A Nichols on

(continued...)

22

survey property for the ultimate purpose of exercising the right of eminent domain. Mr.

Shawn Posy ("Mr. Posy"), an employee of EQT who was MVP's sole witness before the

circuit court, confirmed in his testimony that "[t]he primary purpose of [MVP's pipeline] is

to deliver gas to the Transco pool."[9] In fact, the only benefit to West Virginia that has been

asserted by MVP in this appeal is the benefit to producers and shippers of the natural gas that

---

[8](...continued)
Eminent Domain, Ch. 7, § 7.05[2][a] (3d ed. 2016) (commenting that the use of eminent domain by corporations labeled "public service corporations" is "restricted and subject to more scrutiny than similar use of eminent domain by a governmental entity"). Indeed, the *Varner* Court cautioned that,

> unless carefully guarded there is great danger, [of] . . . private persons or private corporations, claiming . . . to condemn lands nominally for the public use, but really for their own private use in violation of the rights of private property, as designed to be protected by the Constitution. The courts have therefore in such cases thrown around the owners of private property safeguards, which we should be careful not to permit to be broken down.

21 W. Va at 555-56. *See also* Syl. pt. 2, *Gauley & S.R. Co. v. Vencill*, 73 W. Va. 650, 80 S.E. 1103 (1914) ("Before a corporation, though thus chartered and organized, can lawfully condemn private property, it must appear, when denied, that the use is public, and not merely private."); *Pittsburg, W. & K.R. Co. v. Benwood Iron Works*, 31 W. Va. 710, 735, 8 S.E. 453, 467 ("The mere declaration in a petition, that the property is to be appropriated to public use does not make it so; and evidence, that the public will have a right to use it, amounts to nothing in the face of the fact, that the only incentive to ask for the condemnation was a private gain, and it was apparent, that the general public had no interest in it. We would do nothing to hinder the development of the State nor to cripple railroad companies in assisting such development, but at the same time we must protect the property-rights of the citizens. Whatever corporations may be entitled under a proper construction of the law they will receive; but they must not be permitted to take private property for private use.").

[9]The Transco pool is located in Pittsylvania County, Virginia, and serves the east coast of the United States.

23

is located in West Virginia.  Significantly, however, the owners of that natural gas are affiliates of MVP.  On this point, Mr. Posy testified as follows:

> Q.      And there's no question at all, is there, that the bulk of this gas is coming from *under the land* of many, many West Virginians in north-central, West Virginia?
>
> A.      That's correct.

(Emphasis added).  Although the gas is coming from "*under the land*" of West Virginians, Mr. Posy's testimony was clear that the gas is *owned* by affiliates of MVP:

> Q.      You testified that MVP doesn't directly hold title to any gas in the pipeline.  Do any of the principals in MVP own the gas that'll be shipped?
>
> A.      I believe the parent company does.
>
> Q.      Parent company does.  Are there any other affiliates that own the gas?
>
> A.      Well, when I say parent, I meant affiliates.

MVP is a joint venture between affiliates of EQT Corporation, NextEra Energy, Inc., WGL Holdings, Inc., Vega Energy Partners, Ltd., EQT Midstream Partners, LP, and NextEra US Gas Assets, LLC.  Moreover, the evidence in this case further demonstrated that up to ninety-five percent of the gas that will be shipped through MVP's pipeline will be owned and produced by MVP's affiliated companies:

> Q.      What percentage of the gas that's going to run through the MVP pipeline do you think is coming from affiliates or parents or people with relationships to MVP?
>
> A.      With my understanding, you know, 85 to 95 percent.

24

There simply is nothing in the record presented in this case to demonstrate anything other than speculative public use resulting from MVP's pipeline. MVP contends that there is a *possibility* and *potential* that some of the gas would reach West Virginia consumers; however, MVP has not entered any agreements for the same. On this topic, Mr. Posy testified:

> Q. What firm commitments do you have from [Local Distribution Companies (LDCs)] in West Virginia?
>
> A. I personally am not aware of firm commitments, other than - a firm commitment is more of a shipper firm commitment, not an end-use commitment.
>
> Q. Understood. Nonetheless, a tap is going to have to go on your intrastructure; is that correct?
>
> A. Yes.
>
> Q. What taps for LDCs have you committed to in West Virginia?
>
> A. Specifically at this point, I am aware of none.

Similarly, although local producers and shippers of natural gas may submit "tap requests" to MVP in order to ship their natural gas using MVP's pipeline, MVP retains the right to refuse such requests in accordance with federal law. The record reflects no firm agreements to ship natural gas through MVP's pipeline for anyone other than MVP affiliated companies. Thus, this case represents exactly the type of private taking for private use that is prohibited.

25

While there is evidence that consumers outside of West Virginia will benefit from receiving natural gas via MVP's pipeline, the circuit court correctly found that the State of West Virginia may exercise the right of eminent domain or authorize the exercise of that right *only for the use and benefit of West Virginians*:

> The sovereign's power of eminent domain, whether exercised by it or delegated to another, is limited to the sphere of its control and within the jurisdiction of the sovereign. A state's power exists only within its territorial limits for the use and benefit of the people within the state. Thus, property in one state cannot be condemned for the sole purpose of serving a public use in another state.

*Clark v. Gulf Power Co.*, 198 So. 2d 368, 371 (Fla. Dist. Ct. App. 1967). *See also Adams v. Greenwich Water Co.*, 138 Conn. 205, 214, 83 A.2d 177, 182 (1951) (observing that "no state is permitted to exercise or authorize the exercise of the power of eminent domain except for a public use within its own borders" (and collecting cases)); *Square Butte Elec. Co-op. v. Hilken*, 244 N.W.2d 519, 525 (N.D. 1976) (recognizing that "although other states may also be benefited, the public in the state which authorizes the taking must derive a substantial and direct benefit . . ., something greater than an indirect advantage").[10] In this vein, the

---

[10]MVP may nevertheless gain authorization to enter upon and survey the McCurdys' land from FERC. The federal court that considered this very case on removal, but ultimately remanded, found that

> [the McCurdys] represented in their motion to reconsider, and [MVP] acknowledged at oral argument on this matter, that the terms of a conditional FERC Certificate would grant [MVP] the right to enter and survey [the McCurdys'] property. Furthermore, [MVP] represented that it plans to use West

(continued...)

Court of Appeals of Kentucky recently concluded that a pipeline was not in public service to Kentuckians where no gas would reach Kentucky consumers. *See Bluegrass Pipeline Co., LLC v. Kentuckians United to Restrain Eminent Domain, Inc.*, 478 S.W.3d 386, 392 (Ky. Ct. App. 2015) (concluding that "the NGLs [(natural gas liquids)] in Bluegrass's pipeline are being transported to a facility in the Gulf of Mexico. If these NGLs are not reaching Kentucky consumers, then Bluegrass and its pipeline cannot be said to be in the public service of Kentucky").

Based upon the analysis set out above, we find no error in the circuit court's conclusion that MVP's pipeline is not for a public use.

---

[10](...continued)
Virginia eminent domain law to gain access to property within the pipeline's proposed corridor, but ultimately plans to use federal eminent domain law to condemn property and build the pipeline. As a result, a potential ruling in [the McCurdys'] favor would not doom the pipeline. [The McCurdys] are entitled to seek the relief which state law affords them, even if that relief is rendered moot by a conditional FERC Certificate.

*McCurdy v. Mountain Valley Pipeline, LLC*, No. CIV. A. 1:15-03833, 2015 WL 4497407, at *7 (S.D.W. Va. July 23, 2015).

**IV.**

**CONCLUSION**

Because the circuit court correctly concluded that MVP could enter the McCurdys' land to survey the same only if the MVP pipeline was for a public use, and because we find no error in the circuit court's conclusion that the MVP pipeline is not being constructed for a public use in West Virginia, we affirm the August 19, 2015, order of the Circuit Court of Monroe County.

Affirmed.