# IN THE SUPREME COURT OF IOWA

No. 17–0423

Filed May 31, 2019

**KEITH PUNTENNEY; LAVERNE I. JOHNSON; RICHARD R. LAMB,** Trustee of the Richard R. Lamb Revocable Trust; **MARIAN D. JOHNSON** by her Agent VERDELL JOHNSON, **NORTHWEST IOWA LANDOWNERS ASSOCIATION; IOWA FARMLAND OWNERS ASSOCIATION, INC.;** and the **SIERRA CLUB IOWA CHAPTER,**

      Appellants,

and

HICKENBOTTOM EXPERIMENTAL FARMS, INC. and PRENDERGAST ENTERPRISES, INC,

      Petitioners,

vs.

**IOWA UTILITIES BOARD,** A Division of the Department of Commerce, State of Iowa,

      Appellee,

and

**OFFICE OF CONSUMER ADVOCATE** and **THE MAIN COALITION,**

      Intervenors-Appellees,

and

**DAKOTA ACCESS, LLC,**

      Appellee.

---

Appeal from the Iowa District Court for Polk County, Jeffrey D. Farrell, Judge.

Landowners appeal a district court decision denying a petition for judicial review of a decision by the Iowa Utilities Board authorizing a company to use eminent domain to build a crude oil pipeline. **AFFIRMED.**


William E. Hanigan and Jason R. Lawrence of Davis, Brown, Koehn, Shors & Roberts, P.C., Des Moines, for appellants Richard R. Lamb; Marian D. Johnson by Agent, Verdell Johnson; Northwest Iowa Landowners Association; and Iowa Farmland Owners Association, Inc.

Wallace L. Taylor of Law Offices of Wallace L. Taylor, Cedar Rapids, for appellants Keith Puntenney, LaVerne I. Johnson, and Sierra Club Iowa Chapter.


Bret A. Dublinske and Brant M. Leonard of Fredrikson & Byron, P.A., Des Moines, for appellee Dakota Access, LLC.

David J. Lynch (until withdrawal), Cecil I. Wright II, and Benjamin J. Flickinger, Des Moines, for appellee Iowa Utilities Board.

Mark R. Schuling and John S. Long, Des Moines, for intervenor-appellee Office of Consumer Advocate.

Matthew C. McDermott and Espnola F. Cartmill of Belin McCormick, P.C., Des Moines, for intervenor-appellee The Main Coalition.


David Bookbinder, Washington, D.C., and Scott L. Long of Long & Gilliam, Des Moines, for amicus curiae Niskanen Center.

**MANSFIELD, Justice.**

The Bakken Oil Field has made North Dakota the second leading oil-producing state in our country. Almost all of America's oil-refining capacity, however, is located elsewhere in the nation. For this reason, an underground crude oil pipeline was proposed that would run from western North Dakota across South Dakota and Iowa to an oil transportation hub in southern Illinois. Following a lengthy administrative proceeding, the Iowa Utilities Board (IUB) approved the construction of this pipeline in Iowa and approved the use of eminent domain where necessary to condemn easements along the pipeline route.

Several landowners and an environmental organization sought judicial review. They contended the pipeline did not serve the "public convenience and necessity" as required by law, *see* Iowa Code § 479B.9 (2016); did not meet the statutory standard required for a taking of agricultural land, *see id.* §§ 6A.21(1)(*c*), .22(1); and did not meet the constitutional definition of "public use" set forth in article I, section 18 of the Iowa Constitution and the Fifth Amendment to the United States Constitution. Two of the landowners also raised claims personal to them. The district court denied the petitions for judicial review, and the petitioners have appealed.

On appeal, we conclude that the IUB's weighing of benefits and costs supports its determination that the pipeline serves the public convenience and necessity. We also conclude that the pipeline is both a company "under the jurisdiction of the [IUB]" and a "common carrier," and therefore is not barred by Iowa Code sections 6A.21 and 6A.22 from utilizing eminent domain. *See id.* §§ 6A.21(2), .22(2)(*a*)(2). In addition, we conclude that the use of eminent domain for a traditional public use such as an oil pipeline does not violate the Iowa Constitution or the United States

Constitution simply because the pipeline passes through the state without taking on or letting off oil. Lastly, we determine that the IUB's resolution of the two individual landowner claims was supported by the law and substantial evidence. For these reasons, we affirm the district court's judgment.

### I. Background Facts and Proceedings.

In October 2014, Dakota Access, LLC (Dakota Access) filed documents with the IUB disclosing its intent to construct an underground crude oil pipeline from western North Dakota to Patoka, Illinois, an oil transportation hub. The pipeline would traverse Iowa from the northwest corner to the southeast corner of the state, passing through eighteen counties over a distance of approximately 343 miles.

In December 2014, as required by law, Dakota Access held informational meetings, attended by IUB representatives, in each of the eighteen counties. *See id.* § 479B.4. The following month, Dakota Access filed a petition with the IUB for authority to construct the pipeline. *See id.* §§ 479B.4–.5. In the petition, Dakota Access sought "the use of the right of eminent domain for securing right of way for the proposed pipeline project." *See id.* § 479B.16. Various parties requested and were granted permission to intervene, including landowners, trade unions, business associations, and environmental groups.

On June 8, the IUB filed a procedural schedule for the case in which it identified three issues for consideration:

> (a) whether the proposed pipeline will promote the public convenience and necessity, (b) whether the location and route of the proposed pipeline should be approved, and (c) whether and to what extent the power of eminent domain should be granted . . . .

The hearing on Dakota Access's application took place in November and December 2015. On the first day, the IUB received public comments from over 200 people both in support of and against the pipeline. An eleven-day evidentiary hearing followed. During that hearing, sixty-nine witnesses testified. After the conclusion of the hearing, the IUB received posthearing briefs.

On March 10, 2016, the IUB issued a 159-page final decision and order. First, it addressed whether the pipeline would promote the public convenience and necessity. The IUB concluded that the public convenience and necessity test should be treated "as a balancing test, weighing the public benefits of the proposed project against the public and private costs or other deteriments as established by the evidence in the record." It also concluded that it could consider "public benefits outside of Iowa" for an interstate oil pipeline. In addition, the IUB noted that climate change is "a very important issue," but that the pipeline "represents, at most, a change in the method of crude oil deliveries that are already taking place and that will continue to take place regardless of whether this pipeline is built." The IUB further found that "the increased safety associated with pipeline transport of crude oil is significant" as compared to existing rail transportation of that oil.

Continuing, the IUB also found overall economic benefits to Iowa from the construction and operation of the pipeline. And while it observed that it would be impossible to build and operate a pipeline without any environmental impact, it found that the route was "selected in a manner intended to minimize adverse environmental impacts" and specifically "to minimize the possibility of leaks." It added that "Dakota Access has taken reasonable steps to reduce the safety risks associated with the proposed pipeline."

The IUB required that the parent companies of Dakota Access provide unconditional financial guarantees of the pipeline's liabilities and made a series of modifications to the agricultural impact mitigation plan. Among other things, the IUB required that the pipeline be installed at a minimum depth of forty-eight inches where reasonably possible, that all tiling be repaired and restored, and that Dakota Access provide a GPS map to the landowner of any tiling found during construction.

Ultimately, the IUB found that the pipeline would promote the public convenience and necessity. It did so primarily for two reasons:

> First, the proposed pipeline represents a significantly safer way to move crude oil from the field to the refinery when compared to the primary alternative, rail transport. The most credible evidence in this record, based on data from the U.S. Department of Transportation, shows that the spill incident rate for transport of crude oil by rail transport is three to four times higher than the incident rate for pipeline transport on a ton-mile basis. The oil is going to be produced and shipped as long as the market demands it; given that reality, shipping by the safest available method makes sense.

Second, in the IUB's view, there would be considerable economic benefits "associated with the construction, operation, and maintenance of the proposed pipeline."

On the other side of the ledger, the IUB noted that there were potential adverse environmental and agricultural impacts from the pipeline as well as effects on the landowners whose land would be trenched. Yet, with certain precautionary measures in place, it found that the benefits outweighed the costs associated with the project.

Regarding the pipeline's route through Iowa, the IUB observed that Dakota Access had used a software program that evaluated alternative routes and "developed a route that would avoid those land areas where the pipeline could impact critical structures or habitat." It found that a zigzag

route that contained right angles and followed division lines (as proposed by some landowners) would create additional safety issues.

The IUB then turned to the eminent domain issues. It found that sections 6A.21 and 6A.22 gave authority to a pipeline company under the IUB's jurisdiction to condemn an easement for "public use." It concluded that this statutory public-use requirement had been met. In addition, it determined that constitutional objections to the exercise of eminent domain were resolved by the statutory public-use determination.

The IUB also considered a series of objections by landowners to the exercise of eminent domain over their specific properties. In several instances, it sustained the objections in whole or in part. Thus, in one case, it required that the route be relocated to avoid additional buildings that were being constructed for a turkey farm. In response to another landowner's plea, the IUB directed the preservation of certain fruit trees that were roosting places for several species of bats. The IUB also refused, on legal grounds, to allow the condemnation of property that was owned by governmental entities such as counties.

The IUB was not persuaded, however, by landowner Keith Puntenney's objection. Puntenney requested that the pipeline's path be diverted because he wanted to install three wind turbines on his property in the area of the proposed route. But the IUB concluded that there was no "firm plan" to install wind turbines and "it has not been shown that the pipeline would necessarily interfere with the possible future installation of wind-driven turbine generators." As to landowner LaVerne Johnson, the IUB did not agree that the pipeline could not cross his tiling system, although it did require that the pipeline be bored under his tiling system including the main concrete drainage line.

Following the IUB's final decision and order, several motions for clarification and rehearing were filed. On April 28, the IUB issued an order denying these motions.

On May 26 and May 27, several petitions for judicial review were filed in the Polk County District Court. The petitioners included Puntenney, Johnson, the Sierra Club, and a group of landowners known as the Lamb petitioners. The petitions were later consolidated for hearing.

Meanwhile, in June, Dakota Access began construction of the pipeline in Iowa. On August 9, the Lamb petitioners asked the district court to stay any construction activity on their property. The stays would have been limited to construction on the fifteen parcels of land owned by the Lamb petitioners and would not have extended statewide. In their expedited relief request, the Lamb petitioners argued, "Until the pipeline trench is actually dug, petitioners' claims are not moot," and added that "if they do not receive a stay before [Dakota Access's] pipeline trench is dug, any remedy will be inadequate."

On August 21, the district court denied the request for stay because the Lamb petitioners had failed to seek relief first from the IUB. *See id.* § 17A.19(5)(*c*). The Lamb petitioners returned to the IUB, which denied the stay. On August 29, the district court denied the Lamb petitioners' renewed request for a stay. No request was made to this court for interlocutory review of the denial of the stay.

On February 15, 2017, following briefing and argument, the district court denied the petitions for judicial review. Regarding the question of public convenience and necessity, the court concluded that the IUB had "balanced the pros and cons of the project and entered a reasonable decision based on the evidence presented." It added that the decision was "supported by substantial evidence."

On the eminent domain question, the district court reasoned that Iowa Code sections 6A.21 and 6A.22 conferred condemnation authority on common-carrier pipelines under the jurisdiction of the IUB. It also found that the condemnations were for a public use, thus meeting the requirements of the Fifth and Fourteenth Amendments and article I, section 18 of the Iowa Constitution. Finally, it overruled the specific claims advanced by Puntenney and Johnson as to the exercise of eminent domain over their properties.

Puntenney, Johnson, the Sierra Club, and the Lamb petitioners appealed. We retained the appeal.

## II. Standard of Review.

When an administrative review proceeding is before us, we "apply the standards set forth in section 17A.19(10) and determine whether our application of those standards produce[s] the same result as reached by the district court." *Hawkeye Land Co. v. Iowa Utils. Bd.*, 847 N.W.2d 199, 207 (Iowa 2014) (alteration in original) (quoting *Auen v. Alcoholic Beverages Div.*, 679 N.W.2d 586, 589 (Iowa 2004)).

Accordingly, "we review constitutional issues in agency proceedings de novo." *Id.* at 208 (quoting *NextEra Energy Res. LLC v. Iowa Utils. Bd.*, 815 N.W.2d 30, 44 (Iowa 2012)); *see also* Iowa Code § 17A.19(10)(*a*).

Regarding an agency's interpretation of a statute:

> If the legislature clearly vested the agency with the authority to interpret specific terms of a statute, then we defer to the agency's interpretation of the statute and may only reverse if the interpretation is "irrational, illogical, or wholly unjustifiable." If, however, the legislature did not clearly vest the agency with the authority to interpret the statute, then our review is for correction of errors at law.

*NextEra*, 815 N.W.2d at 37 (citations omitted) (quoting *Doe v. Iowa Dep't of Human Servs.*, 786 N.W.2d 853, 857 (Iowa 2010)); *see also* Iowa Code § 17A.19(10)(*c*), (*l*).

Here, we think the legislature clearly vested the IUB with the authority to interpret "public convenience and necessity" as used in Iowa Code section 479B.9. We reach this conclusion for several reasons.

First, we believe "public convenience and necessity" is a term of art within the expertise of the IUB. *See Renda v. Iowa Civil Rights Comm'n*, 784 N.W.2d 8, 14 (Iowa 2010) (referring to "a substantive term within the special expertise of the agency").

In addition, the Iowa Code itself indicates that the legislature wanted the IUB to have leeway in determining public convenience and necessity. Section 479B.9 states,

> The board may grant a permit in whole or in part upon terms, conditions, and restrictions as to location and route as it determines to be just and proper. A permit shall not be granted to a pipeline company *unless the board determines* that the proposed services will promote the public convenience and necessity.

(Emphasis added.) The phrase "unless the board determines" seemingly affords the IUB deference. Otherwise, if the matter were to be left to judicial determination, the statute would say something like, "unless the proposed services will promote the public convenience and necessity."

Additionally, we have previously held that it is not a judicial function to determine whether a service will promote the public convenience and necessity. *See Application of Nat'l Freight Lines*, 241 Iowa 179, 186, 40 N.W.2d 612, 616 (1950) ("We have held several times that the determination whether the service proposed will promote the public convenience and necessity is a legislative, not a judicial, function. . . . It is not for the district court or this court to determine whether the

commission has acted wisely nor to substitute its judgement for that of the commission.")

On the other hand, we do not defer to the IUB's interpretation of Iowa Code sections 6A.21 and 6A.22. Chapter 6A is a general eminent domain law that applies to all state agencies, and the term "public use" is not "uniquely within the subject matter expertise of the agency"—here the IUB. *Renda*, 784 N.W.2d at 14.

Lastly, we review the IUB's factual findings under a substantial evidence standard. *See* Iowa Code § 17A.19(10)(*f*). "The agency's decision does not lack substantial evidence merely because the interpretation of the evidence is open to a fair difference of opinion." *NextEra*, 815 N.W.2d at 42 (quoting *ABC Disposal Sys., Inc. v. Dep't of Nat. Res.*, 681 N.W.2d 596, 603 (Iowa 2004)).

### III. Standing of the Sierra Club.

We must first consider two threshold matters—standing and mootness. Dakota Access challenges the standing of the Sierra Club. The Sierra Club is a nonprofit environmental organization. The Sierra Club is asserting the interests of two of its members—Mark Edwards and Carolyn Raffensperger. Edwards lives in Boone and worked for the Iowa Department of Natural Resources as a trail coordinator for thirty years. He submitted an affidavit expressing concern that the pipeline will damage Iowa's waterways, contribute to climate change, and destroy Native American burial grounds and cultural sites.

Raffensperger lives in Ames. Her home sits about one mile from the pipeline. She submitted an affidavit voicing concern for her own safety and the immediate environment around her property as well as her belief that the pipeline will contribute to climate change, damage Native American cultural sites, and pollute Iowa waterways.

Dakota Access does not dispute that the Sierra Club can assert the interests of its members for standing purposes. *See Citizens for Wash. Square v. City of Davenport*, 277 N.W.2d 882, 886 (Iowa 1979). However, Dakota Access points out that Sierra Club has not shown that any of its members owns property on the pipeline route. Accordingly, Dakota Access maintains that the Sierra Club lacks standing.

We disagree. In *Bushby v. Washington County Conservation Board*, we adopted the United States Supreme Court's standard for standing in environmental disputes. 654 N.W.2d 494, 496–97 (Iowa 2002) ("The United States Supreme Court has held that plaintiffs in cases involving environmental concerns establish standing if 'they aver that they use the affected area and are persons "for whom the aesthetic and recreational values of the area will be lessened" by the challenged activity.'" (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 183, 120 S. Ct. 693, 705 (2000))).

Here, Sierra Club met the *Bushby* standard. Sierra Club members Raffensperger and Edwards submitted affidavits describing their use and enjoyment of the rivers, streams, soil, and other natural areas and aesthetics. They described their concerns that the construction and operation of the pipeline would have adverse environmental impacts on those areas that they use and enjoy.

Raffensperger's and Edwards's concerns are not entirely speculative, remote, and in the uncertain future as Dakota Access suggests. Sierra Club presented the IUB with actual evidence of pipeline accidents that have resulted in millions of dollars in cleanup and damages.

Nothing in the Iowa Code limits standing in pipeline proceedings to individuals whose property is in the direct path of the pipeline. Section 479B.7 allows any person "whose rights or interests may be affected by

the proposed pipeline" to file objections. Iowa Code § 479B.7. Section 17A.19 authorizes any "person or party whose is aggrieved or adversely affected by agency action" to seek judicial review. *Id.* § 17A.19. The Sierra Club has standing.

### IV. Mootness.

Dakota Access next argues that the appeal is moot. This presents a closer issue. The pipeline was actually completed two years ago in May 2017 at a cost of approximately $4 billion. Since then it has been regularly carrying crude oil from North Dakota to Illinois. Its capacity is 450,000 barrels of oil per day. The record does not indicate how much Dakota Access actually paid for easements to bury the pipeline underground in Iowa, but the projected cost was $85 million. Where the pipeline was buried during construction, land restoration has already taken place.

Iowa Code section 17A.19 states in part, "The filing of the petition for review does not itself stay execution or enforcement of any agency action." *Id.* § 17A.19(5)(*a*). In short, it places the burden on the party contesting agency action to obtain a stay. As noted above, the Lamb petitioners' application for a stay from the district court was denied nearly three years ago. They did not seek a stay from this court, nor did they ask to expedite this appeal when it was filed over two years ago.[1]

Ninety years ago, this court ruled that an eminent domain appeal challenging the taking of the plaintiff's twenty-tree apple orchard was moot once the road in question had been built. *Welton v. Iowa State Highway Comm'n*, 208 Iowa 1401, 1401, 227 N.W. 332, 333 (1929). We explained,

> It is substantiated by uncontroverted affidavit that, *subsequent to the decision of the district court in this case, and in the absence of an order staying appellees' actions, the road*

---

[1]Filing an appeal does not result in an automatic stay of a trial court ruling. *See* Iowa R. App. P. 6.601(1).

> *in controversy was established*, and the land in question, including the claimed orchard, was taken and used by the appellees for primary road purposes, and that the road has been fully constructed and paved through the premises involved in this action; that the appellant has perfected an appeal to the district court of Mahaska county, from the award of the condemnation commissioners, as to the amount of his damages, by reason of the taking of the identical property involved in this action, and which cause was assigned for trial in the district court of Mahaska county, to begin on the very day of the submission of this cause to this court. It will thus be observed that, *during the pendency of the appeal, the defendant did not obtain a restraining order from this court*, as was done in the Hoover Case, supra. This court has the power, upon application being made, to grant a restraining order to maintain the status quo of the parties during the pendency of an appeal, and, when no other means of protection is afforded by the law, there is no hesitancy in granting the order.
>
> It is apparent from the uncontroverted affidavit that the orchard has been taken for highway purposes and the paving laid. No order which we can now make can preserve to appellant his orchard.

*Id.* (emphasis added) (citations omitted).

*Welton* arguably should control here. As in *Welton*, the petitioners lost on the merits and then did not try to obtain a stay from this court while a substantial construction project went forward. *See id.*

Similarly, in *Porter v. Board of Supervisors*, we held it was too late for us to enjoin condemnation proceedings once a drainage ditch had been installed:

> We call attention also to the fact that it was stated in oral argument, and not denied, that the construction had already taken place and that the canal or ditch was in operation. There was no stay of proceedings nor application in this court for an order to stay construction. Under these circumstances the construction of the ditch became an established fact before the case was submitted to us for decision.

238 Iowa 1399, 1404, 28 N.W.2d 841, 844 (1947).

On the other hand, in *Lewis Investments, Inc. v. City of Iowa City*, we held that an appeal from an order condemning a property as a nuisance

so the city could rehabilitate it was *not* moot, because the only thing that had happened was that the city had paid its deposit and taken possession of the property. 703 N.W.2d 180, 184 (Iowa 2005). We observed that

> the city's ultimate goal—transfer of the property to a private individual for rehabilitation or demolition—has not become an accomplished fact like the road in *Welton*. There is nothing in the record to show that the property has been transferred or that substantial improvements have been made to the property that would place it beyond the power of this court to restore the parties to their former positions. Therefore, we hold the appeal is not moot.

*Id.* In short, *Lewis Investments* was distinguishable from *Welton* because no work had been performed on the property.

The petitioners counter that the case is not moot because the courts could order relief other than a tear-out of the entire pipeline. For example, the pipeline could be partially removed and rerouted around the petitioners' properties. Another possibility is that the petitioners could obtain trespass damages. It is noteworthy that most property owners along the route chose to make voluntary easement agreements with Dakota Access to allow the pipeline to go underneath their farmland; hence, their rights and status might not be affected by a decision in this case. The petitioners also counter that a lawsuit of these constitutional and practical dimensions should not become moot simply because Dakota Access chose to proceed with construction while the petitioners' judicial review proceeding was still pending.

One case worth considering is *Grandview Baptist Church v. Zoning Board of Adjustment*, 301 N.W.2d 704 (Iowa 1981). In *Grandview Baptist*, a church obtained a permit from the building commissioner to build a steel storage building. *Id.* at 706. Within days, a contractor built the building and several neighboring property owners appealed the granting of the permit to the zoning board of adjustment. *Id.* The board ruled that the

structure was not proper and had to be removed. *Id.* Both the district court and our court upheld the board's action. *Id.* at 708–09.

In our decision, we rejected the church's argument that it was too late for our court to do anything about the building. *Id.* at 709. We elaborated,

> The objectors timely appealed to the board, but before their appeal was heard the building had been constructed. The Church claims the objectors are estopped because the Church has vested rights in the building.
>
> Under such circumstances the Church cannot successfully invoke the doctrine of vested rights so as to deprive the objectors of the fruits of their appeal. Otherwise the right of appeal would be meaningless.

*Id.*

We are not persuaded that *Grandview Baptist* controls here. There the contractor put up the storage building based on an administrator's go-ahead before any hearing could occur. *Id.* at 706. The church then lost at the board of adjustment and at every subsequent stage of the proceedings. *Id.* The "right of appeal" referred to in *Grandview Baptist Church* was the right to appeal an individual's granting of a permit to the board of adjustment, not the right to appeal an agency action to the district court or a district court ruling to the Iowa Supreme Court. *See id.* at 709.

Iowa Code section 414.11 governs city board of adjustment appeals and states that an appeal from the city administrative officer to the board of adjustment

> stays all proceedings in furtherance of the action appealed from, unless the officer from whom the appeal is taken certifies to the board of adjustment after the notice of appeal shall have been filed with the officer that by reason of facts stated in the certificate a stay would in the officer's opinion cause imminent peril to life or property.

This is different from section 17A.19(5)(*a*), which provides that an appeal does not stay administrative action.

Nonetheless, after careful consideration, we do not believe the present appeal is moot. "The key in assessing whether an appeal is moot is determining whether the opinion would be of force or effect in the underlying controversy." *Perkins v. Bd. of Supervisors*, 636 N.W.2d 58, 64 (Iowa 2001). We are not persuaded that a decision in this case would lack force or effect. Although dismantling of the pipeline would not be feasible, the IUB still has authority to impose other "terms, conditions, and restrictions" to implement a ruling favorable to the petitioners. Iowa Code § 479B.9; *see also Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 301 F. Supp. 3d 50, 61–64 (D.D.C. 2018) (dismissing National Historic Preservation Act claims as mooted by the construction of the Dakota Access pipeline, but proceeding to determine other claims on the merits).

**V. Public Convenience and Necessity.**

Section 479B.9 gives the IUB authority to issue a permit for a pipeline that "will promote the public convenience and necessity." Iowa Code § 479B.9. Chapter 479B begins,

> It is the purpose of the general assembly in enacting this law to grant the utilities board the authority to implement certain controls over hazardous liquid pipelines to protect landowners and tenants from environmental or economic damages which may result from the construction, operation, or maintenance of a hazardous liquid pipeline or underground storage facility within the state, to approve the location and route of hazardous liquid pipelines, and to grant rights of eminent domain where necessary.

*Id.* § 479B.1.

Regarding the meaning of "public convenience and necessity," our court has held,

The words are not synonymous, and effect must be given both. The word "convenience" is much broader and more inclusive than the word "necessity." Most things that are necessities are also conveniences, but not all conveniences are necessities. . . . The word "necessity" has been used in a variety of statutes . . . . It has been generally held to mean something more nearly akin to convenience than the definition found in standard dictionaries would indicate. So it is said the word will be construed to mean not absolute, but reasonable, necessity.

*Thomson v. Iowa State Commerce Comm'n*, 235 Iowa 469, 475, 15 N.W.2d 603, 606 (1944) (quoting *Wis. Tel. Co. v. R.R. Comm'n*, 156 N.W. 614, 617 (Wis. 1916)). In its order, the IUB looked to *Thomson* for guidance as well as an Illinois case construing the same phrase, which held,

The word connotes different degrees of necessity. It sometimes means indispensable; at others, needful, requisite, or conducive. It is relative rather than absolute. No definition can be given that would fit all statutes. The meaning must be ascertained by reference to the context, and to the objects and purposes of the statute in which it is found.

*Wabash, Chester & W. Ry. v. Commerce Comm'n ex rel. Jefferson Sw. R.R.*, 141 N.E. 212, 215 (Ill. 1923). The IUB also relied on our decision in *S.E. Iowa Cooperative Electric Association v. Iowa Utilities Board*, which approved the IUB's use of a balancing test in a related context and its determination that "the substantial benefits [of the project] outweighed the costs." 633 N.W.2d 814, 821 (Iowa 2001).

In our view, the IUB's balancing approach to public convenience and necessity should be upheld because it is not "irrational, illogical, or wholly unjustifiable." Iowa Code § 17A.19(10)(*l*). The approach is consistent with our prior caselaw and is supported by legal authority elsewhere. *See Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 365 U.S. 1, 23, 81 S. Ct. 435, 447 (1961) (indicating that " 'public convenience and necessity' connotes a flexible balancing process, in the course of which all the factors are weighed prior to final determination").

Putenney, Johnson, and the Sierra Club challenge the IUB's determination of public convenience and necessity on several grounds. First, they urge that the pipeline does not serve the public because shippers wanted it. But shippers wanted it as a way of reducing transportation costs. Given that petroleum products are commodities sold in a competitive market, lower costs for crude oil transportation tend to keep prices of crude oil derivatives lower than they otherwise would be.

Iowa is a heavy user of petroleum products. Iowa consumes the equivalent of 85.2 million barrels of oil per year but produces no oil itself. Iowa is fifth in the country in per capita energy use. Iowa ranks eighth in the country in per capita gasoline consumption. Iowa's percentage of gross domestic product from manufacturing ranks near the top in this country, and Iowa ranks sixth highest nationally in energy consumption per capita in its industrial sector. The record indicates that the Dakota Access pipeline will lead to "longer-term, reduced prices on refined products and goods and service dependent on crude oil and refined products." We agree with the IUB that these are public benefits, even though the pipeline also provides benefits to the shippers of crude oil. *See S.E. Iowa Coop. Elec.,* 633 N.W.2d at 820 (stating that "cost savings are a legitimate consideration").[2]

Next, Puntenney, Johnson, and the Sierra Club contend that drilling in the Bakken Oil Field has declined, demonstrating a reduced need for pipeline transportation. But according to the evidence before the IUB, actual crude oil production from the Bakken Oil Field has only declined

---

[2]The Sierra Club makes a forceful environmental argument against the Dakota Access pipeline. But this environmental argument *against* the pipeline to a degree bolsters the economic argument *for* the pipeline. That is, the Sierra Club criticizes the pipeline for making it "easier" to bring Bakken Oil Field oil to the market. Another way of saying "easier" is "cheaper" or "more economical."

about 10%, from approximately 1.2 million barrels per day to approximately 1.1 million barrels per day. At the time of the hearing, the demand for the pipeline was still there. As the IUB pointed out, shippers had executed long-term "take or pay" contracts, committing to pay for pipeline use whether they shipped oil or not.

Additionally, Puntenney, Johnson, and the Sierra Club maintain that rail transportation is safer than the pipeline transportation that would replace it. Various data were presented to the IUB on this issue. However, the IUB found, and the data support, that on a volume-distance basis (i.e., per barrel-mile), pipeline transportation of oil is safer than rail transportation of oil.

Lastly, Puntenney, Johnson, and the Sierra Club challenge the IUB's reliance on secondary economic benefits resulting from the construction and operation of the pipeline in Iowa. For example, the IUB observed that the pipeline would result in at least 3100 construction jobs in Iowa, at least twelve long-term jobs for Iowans, and more than $27 million annually in property tax revenue. As the Puntenney petitioners point out, Dakota Access, the IUB, and the district court cited no authority that these types of benefits can be taken into account in making a public-convenience-and-necessity determination. Yet the Puntenney petitioners cited no authority that these benefits *cannot* be considered. *See N. Plains Res. Council v. Surface Transp. Bd.*, 668 F.3d 1067, 1094–95 (9th Cir. 2011) (noting that the Surface Transportation Board considered "new jobs created by the construction and operation of the new rail line"); *Pliura Intervenors v. Ill. Commerce Comm'n,* 942 N.E.2d 576, 585 (Ill. App. Ct. 2010) (considering, among other things, "increased revenues for local economies" resulting from a pipeline extension); *Accokeek, Mattawoman, Piscataway Creeks Cmtys. Council, Inc. v. Md. Pub. Serv. Comm'n,* 133 A.3d 1228, 1240 (Md.

Ct. Spec. App. 2016) (treating "monetary benefits from construction employment and longer-term tax payments" as benefits relevant to the public-convenience-and-necessity determination). We are not persuaded that the IUB acted improperly in factoring these benefits into the public-convenience-and-necessity determination.

For the foregoing reasons, upon our review of the record, we conclude the IUB's legal determinations with respect to public convenience and necessity were not "[b]ased upon an irrational, illogical, or wholly unjustifiable application of law" and its factual determinations were supported by "substantial evidence." Iowa Code § 17A.19(10)(*f*), (*l*).

**VI.  Statutory Limits on the Exercise of Eminent Domain.**

The Lamb petitioners argue that Dakota Access's exercise of eminent domain over farmland would violate Iowa Code sections 6A.21 and 6A.22. Section 6A.21(1)(*c*) limits the authority to condemn agricultural lands by defining "public use," "public purpose," or "public improvement" in a way that requires landowner consent. *Id.* § 6A.21(1)(*c*). Hence, section 6A.21(1)(*c*) reads, " '*Public use*' or '*public purpose*' or '*public improvement*' does not include the authority to condemn agricultural land for private development purposes unless the owner of the agricultural land consents to the condemnation." *Id.*

But section 6A.21 also carves out exceptions. *See id.* § 6A.21(2). One of them is that "[t]his limitation also does not apply to utilities, persons, companies, or corporations under the jurisdiction of the Iowa utilities board." *Id.*

The Lamb petitioners argue vigorously that Dakota Access is not a "utility." That, however, is not the full wording of the exception. We agree with the IUB and the district court that Dakota Access is a "compan[y] . . . under the jurisdiction of the [IUB]," *id.,* via the permit process laid out in

chapter 479B. Therefore, landowner consent is not required by section 6A.21 prior to condemnation.

The Lamb petitioners urge us to apply the canon of *ejusdem generis* to section 6A.21(2). Hence, they ask us to interpret "persons, companies, or corporations" as related to the immediately preceding word, "utilities." Their argument is difficult to follow. If the Lamb petitioners are saying that the phrase "persons, companies, or corporations" refers to *kinds* of utilities, then the word "utilities" would be sufficient by itself and the remaining language would become unnecessary. That would contravene an established principle of statutory construction. *See id.* § 4.4(2) (setting forth the presumption that "[t]he entire statute is intended to be effective"). On the other hand, if the Lamb petitioners are saying that the phrase "persons, companies, or corporations" refers to entities *other than* utilities that are nonetheless under the jurisdiction of the IUB, then Dakota Access seemingly falls in that category.

The IUB also advances an alternative ground for rejecting the Lamb petitioners' argument. It notes that section 6A.22(2) authorizes "[t]he acquisition of any interest in property necessary to the function of . . . a common carrier." *Id.* § 6A.22(2)(*a*)(2). In the IUB's view, Dakota Access qualifies as a common carrier.

There is no dispute that most of the pipeline capacity has been contracted to shippers in advance; however, 10% is required to be made available for walk-up business. That is all the Federal Energy Regulatory Commission requires of a common carrier. *See, e.g.*, *Navigator BSG Transp. & Storage*, 152 F.E.R.C. ¶ 61,026, at 61,127 (July 10, 2015); *Shell Pipeline Co.*, 146 F.E.R.C. ¶ 61,051, at 61,238 (Jan. 29, 2014). The IUB maintains it is enough here.

Based on the record before us, and our own common-carrier precedents, we agree with the IUB. It would be unrealistic to require a $4 billion pipeline to depend entirely on walk-up business, just as it would be unrealistic to require an airline to refuse all advance bookings for a flight. The key is whether spot shippers have access, and the federal agency with expertise in the matter has concluded that 10% is sufficient. We have said that "a common carrier need not serve all the public all the time." *Wright v. Midwest Old Settlers & Threshers Ass'n*, 556 N.W.2d 808, 810 (Iowa 1996) (per curiam). A common carrier may combine "other vocations" and still be considered a common carrier. *Id.* at 811. Long ago we held that a trucker who transported films and advertising for members who had signed an alleged association agreement was still a common carrier where he also transported films and advertising for theaters that had not signed the agreement. *State ex rel. Bd. of R.R. Comm'rs v. Rosenstein*, 217 Iowa 985, 989–93, 252 N.W. 251, 254–55 (1934). Significantly, Dakota Access does not involve a situation where service "has been *limited* to those under contract." *State ex rel. Bd. of R.R. Comm'rs v. Carlson*, 217 Iowa 854, 857, 251 N.W. 160, 161 (1933) (emphasis added).[3]

The Lamb petitioners insist that the Dakota Access pipeline is not a common carrier because it does not serve "the Iowa public." Yet adding

---

[3]In *Mid-American Pipeline Company v. Iowa State Commerce Commission*, we said that a grant of eminent domain authority to a private company to construct a pipeline exclusively for its own use was "for a strictly private purpose" and "beyond legislative authority." 253 Iowa 1143, 1146–47, 114 N.W.2d 622, 624 (1962) (noting that "Northern intends to handle only its own products by pipe line and is not a common carrier of such products"). Those are not the facts here. Again, Dakota Access serves a variety of customers and 10% of pipeline capacity is available on a walk-up basis. *See also Crawford Family Farm P'ship v. TransCanada Keystone Pipeline, L.P.*, 409 S.W.3d 908, 922–24 (Tex. App. 2013) (determining that a pipeline would be a common carrier because there was a "reasonable probability" it would ship crude petroleum for one or more customers who would retain ownership of the oil).

the modifier "Iowa" would be a gloss on the statute for which there is no basis in the statute itself. For these reasons, we find no violation of sections 6A.21 and 6A.22.

## VII. Constitutional Authority for the Exercise of Eminent Domain.

This brings us to the most significant issue in the case, whether the use of eminent domain for the Dakota Access pipeline as authorized by Iowa Code section 479B.16 violates article I, section 18 of the Iowa Constitution or the Fifth and Fourteenth Amendments to the United States Constitution.

Section 479B.16 addresses the use of eminent domain for pipelines. It provides in part,

> A pipeline company granted a pipeline permit shall be vested with the right of eminent domain, to the extent necessary and as prescribed and approved by the board, not exceeding seventy-five feet in width for right-of-way and not exceeding one acre in any one location in addition to right-of-way for the location of pumps, pressure apparatus, or other stations or equipment necessary to the proper operation of its pipeline.

Iowa Code § 479B.16.

Article I, section 18, the takings clause in the Iowa Constitution, states in part,

> Private property shall not be taken for public use without just compensation first being made, or secured to be made to the owner thereof, as soon as the damages shall be assessed by a jury, who shall not take into consideration any advantages that may result to said owner on account of the improvement for which it is taken.

Iowa Const. art. I, § 18. The Fifth Amendment to the United States Constitution similarly provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V.

We have said that we consider federal cases interpreting the Federal Takings Clause "persuasive in our interpretation of the state provision," but "not binding." *Kingsway Cathedral v. Iowa Dep't of Transp.*, 711 N.W.2d 6, 9 (Iowa 2006); *see also Harms v. City of Sibley*, 702 N.W.2d 91, 97 (Iowa 2005).

The Lamb petitioners deny that the Dakota Access pipeline furthers a constitutionally valid public use. They contend that the indirect economic benefits of an infrastructure project, such as jobs created or tax revenues generated, cannot be considered in determining public use. They also contend that an oil pipeline that crosses Iowa but does not pick up or drop off oil within the state does not constitute a public use. We will address these arguments in order.

We begin by considering the United States Supreme Court's interpretation of the Fifth Amendment in *Kelo v. City of New London*, 545 U.S. 469, 125 S. Ct. 2655 (2005). In *Kelo*, the Court addressed the question of "whether a city's decision to take property for the purpose of economic development satisfies the 'public use' requirement of the Fifth Amendment." *Id.* at 477, 125 S. Ct. at 2661. There, an economic development plan was intended to remedy decades of economic decline that led to the City of New London being designated a "distressed municipality." *Id.* at 473–75, 125 S. Ct. at 2658–60. A majority of the Court found that the City of New London could compel private homeowners to turn over their homes to a private developer because the city's plan served a "public purpose." *Id.* at 484, 125 S. Ct. at 2665. The Court noted, "For more than a century, our public use jurisprudence has wisely eschewed rigid formulas and intrusive scrutiny in favor of affording legislatures broad latitude in determining what public needs justify the use of the takings power." *Id.* at 483, 125 S. Ct. at 2664.

Justice O'Connor filed a dissenting opinion in which Chief Justice Rehnquist and Justices Scalia and Thomas joined. *Id.* at 494, 125 S. Ct. at 2671 (O'Connor, J., dissenting). She characterized the majority as holding

> that the sovereign may take private property currently put to ordinary private use, and give it over for new, ordinary private use, so long as the new use is predicted to generate some secondary benefit for the public—such as increased tax revenue, more jobs, maybe even esthetic pleasure.

*Id.* at 501, 125 S. Ct. at 2675. In her view, a secondary benefit alone was not enough for a governmental transfer of property from one private entity to another to qualify as a taking for a public purpose. *Id.* She reasoned that almost any lawful use of private property will generate some secondary benefit and, thus, if "positive side effects" are sufficient to classify a transfer from one private party to another as "for public use," those constitutional words would not "realistically exclude *any* takings." *Id.*

Although she did not agree that economic development alone could justify a taking, Justice O'Connor did acknowledge there were three categories of legitimate public use:

> Our cases have generally identified three categories of takings that comply with the public use requirement, though it is in the nature of things that the boundaries between these categories are not always firm. Two are relatively straightforward and uncontroversial. First, the sovereign may transfer private property to public ownership—such as for a road, a hospital, or a military base. Second, the sovereign may transfer private property to private parties, often common carriers, who make the property available for the public's use—such as with a railroad, a public utility, or a stadium. But "public ownership" and "use-by-the-public" are sometimes too constricting and impractical ways to define the scope of the Public Use Clause. Thus we have allowed that, in certain circumstances and to meet certain exigencies, takings that serve a public purpose also satisfy the Constitution even if the property is destined for subsequent private use.

*Id.* at 497–98, 125 S. Ct. at 2673 (citations omitted).

The *Kelo* decision has proved controversial, not least because the development that justified the taking of Ms. Kelo's home never occurred. *See* Alberto B. Lopez, Kelo-*Style Failings*, 72 Ohio St. L.J. 777, 779–80 (2011). Several state supreme courts have held that public use must mean something more than indirect economic benefits. *See, e.g., Sw. Ill. Dev. Auth. v. Nat'l City Envtl., L.L.C.*, 768 N.E.2d 1, 10–11 (Ill. 2002); *County of Wayne v. Hathcock*, 684 N.W.2d 765, 783 (Mich. 2004); *City of Norwood v. Horney*, 853 N.E.2d 1115, 1123 (Ohio 2006); *Bd. of Cty. Comm'rs of Muskogee Cty. v. Lowery*, 136 P.3d 639, 647 (Okla. 2006).

Thus, in *Southwestern Illinois*, the Illinois Supreme Court held that a regional development authority could not exercise eminent domain to take a recycling facility's property and convey it to a private racetrack for a parking lot. 768 N.E.2d at 4, 11. The court concluded the purported benefit of positive economic growth in the region was not enough to satisfy public use as required under the Illinois Constitution. *Id.* at 10–11. The court also found shorter lines to enter parking lots and the fact that pedestrians might be able to cross from parking areas to event areas in a safer manner unpersuasive as sufficient factors to satisfy the public-use requirement. *Id.* at 9.

In *Southwestern Illinois*, the racetrack estimated the condemned land, which was to be used for open-field parking, would lead to an increase of $13 to $14 million in revenue per year. *Id.* at 10. The Illinois court recognized that such profit could trickle down and bring revenue increases to the region. *Id.* Yet it reasoned, "[R]evenue expansion alone does not justify an improper and unacceptable expansion of the eminent domain power of the government." *Id.* at 10–11.

Similarly, in *Hathcock*, the Michigan Supreme Court held a private entity was not entitled to exercise eminent domain to build a business and technology park. 684 N.W.2d at 783–84. The Michigan court determined that something beyond economic benefits was required to show public use under the Michigan Constitution. *Id.* at 783. The court there relied on its own jurisprudence and its interpretation of the Michigan constitutional founders' intent. *Id.* at 785–87. The court, tracking O'Connor's dissent in *Kelo*, concluded,

> [T]he transfer of condemned property to a private entity, seen through the eyes of an individual sophisticated in the law at the time of ratification of our 1963 Constitution, would be appropriate in one of three contexts: (1) where "public necessity of the extreme sort" requires collective action; (2) where the property remains subject to public oversight after transfer to a private entity; and (3) where the property is selected because of "facts of independent public significance," rather than the interests of the private entity to which the property is eventually transferred.

*Id.* at 783. While the Michigan Constitution's takings clause is not identical to ours, it resembles ours in prohibiting takings of private property "for public use without just compensation therefore being first made." Mich. Const. art. X, § 2 (1963) (amended in 2006, after *Hathcock*, to define "public use" as more than "for the purpose of economic development or enhancement of tax revenues").

Adopting *Hathcock*'s reasoning, the Ohio Supreme Court held that economic factors could be considered in determining whether property may be appropriated but could not alone satisfy the public-use requirement of the Ohio Constitution. *Norwood*, 853 N.E.2d at 1123. In *Norwood*, a struggling city (much like New London in *Kelo*) entered into a contract with a private developer to redevelop a neighborhood. *Id.* at 1124. The plans called for over 200 apartments and condominiums, over

500,000 square feet of office and retail space, and two large public-parking facilities. *Id.* at 1124. The city estimated the redeveloped area would bring in $2 million in annual revenue to the city. *Id.*

Several property owners, however, refused to sell for the planned development, and the city therefore tried to exercise eminent domain to take the properties. *Id.* at 1124–26. The Ohio Supreme Court declined to follow the majority opinion in *Kelo*, stating that the *Hathcock* opinion and the dissenting opinions in *Kelo* were better models for interpreting the Ohio Constitution. *Id.* at 1140–41.

> Though the Ohio Constitution may bestow on the sovereign a magnificent power to take private property against the will of the individual who owns it, it also confers an "inviolable" right of property on the people. When the state elects to take private property without the owner's consent, simple justice requires that the state proceed with due concern for the venerable rights it is preempting.

*Id.* at 1137–38.

Along the same lines, the Oklahoma Supreme Court determined that economic development alone was not a public purpose to justify the exercise of eminent domain under the Oklahoma Constitution. *See Bd. of Cty. Comm'rs of Muskogee Cty.*, 136 P.3d at 647. In *Board of County Commissioners*, the city wanted to install three water pipelines, two of which would serve only a proposed privately-owned electric generation plant and which would improve and expand existing public service. *Id.* at 642–43. The private energy company had agreed to build the third public pipeline only if the company first obtained all rights-of-way to construct the energy plant and the accompanying first two water pipelines. *Id.* at 643.

The court reasoned that although one pipeline would serve the public, the purpose of the takings was for the construction and operation

of the privately owned energy company. *Id.* at 649. Further, the court said that although the construction of the energy plant would enhance economic development through taxes, jobs, and investment, those economic benefits alone would not suffice to satisfy the public use requirement. *Id.*

These state constitutional decisions would not necessarily have disappointed the *Kelo* majority. The *Kelo* majority themselves noted that "nothing in our opinion precludes any State from placing further restrictions on its exercise of the takings power." *Kelo*, 545 U.S. at 489, 125 S. Ct. at 2668 (majority opinion). It added that "many States already impose 'public use' requirements that are stricter than the federal baseline," and "[s]ome of these requirements have been established as a matter of state constitutional law." *Id.*

Since *Kelo* was decided, we have twice quoted from Justice O'Connor's dissent. In *Clarke County Reservoir Commission v. Robins*, we noted,

> Justice O'Connor underscored the constitutional necessity that any taking be for a "public use" with "just compensation":
>
>> These two limitations serve to protect the security of Property, which Alexander Hamilton described to the Philadelphia Convention as one of the great obj[ects] of Gov[ernment]. Together they ensure stable property ownership by providing safeguards against excessive, unpredictable, or unfair use of the government's eminent domain power—particularly against those owners who, for whatever reasons, may be unable to protect themselves in the political process against the majority's will.

862 N.W.2d 166, 171–72 (Iowa 2015) (alteration in original) (quoting *Kelo*, 545 U.S. at 496, 124 S. Ct. at 2672 (O'Connor, J., dissenting)). We went on to state, "The public-use requirement is to prevent abuse of the power

for the benefit of private parties." *Id.* And in *Star Equipment, Ltd. v. State*, we observed,

> Four dissenters noted in the context of the Federal Takings Clause: "We give considerable deference to legislatures' determinations about what governmental activities will advantage the public. But were the political branches the sole arbiters of the public-private distinction, the Public Use Clause would amount to little more than hortatory fluff."

843 N.W.2d 446, 459 n.11 (Iowa 2014) (quoting *Kelo*, 545 U.S. at 497, 125 S. Ct. at 2673).

Like our colleagues in Illinois, Michigan, Ohio, and Oklahoma, we find that Justice O'Connor's dissent provides a more sound interpretation of the public-use requirement. If economic development alone were a valid public use, then instead of building a pipeline, Dakota Access could constitutionally condemn Iowa farmland to build a palatial mansion, which could be defended as a valid public use so long as 3100 workers were needed to build it, it employed twelve servants, and it accounted for $27 million in property taxes.[4]

Having said that, this case is not that one. Instead, this case falls into the second category of traditionally valid public uses cited by Justice O'Connor: a common carrier akin to a railroad or a public utility. *See Kelo*, 545 U.S. at 498, 125 S. Ct. at 2673. This kind of taking has long been

---

[4]In fairness to the *Kelo* majority, they did not say that any economic development benefit would meet the public-use test. If the economic benefits of merely building a project qualified as a public use, then the legislature could empower A to take B's house just because A planned to erect something new on the lot. Even the *Kelo* majority did not go that far. *See Kelo*, 545 U.S. at 487, 125 S. Ct. at 2667 ("Such a one-to-one transfer of property, executed outside the confines of an integrated development plan, is not presented in this case."). But as Justice O'Connor noted in dissent, it is problematic to have a fact-based public-use test that allows economic development benefits to suffice in some cases, depending on whether the economic development benefit derives from "a multipart, integrated plan rather than . . . an isolated property transfer." *Id.* at 503–04, 125 S. Ct. at 2676.

recognized in Iowa as a valid public use, even when the operator is a private entity and the primary benefit is a reduction in operational costs.

Back in 1870, when our constitution was only thirteen years old, this court held that a taking for a private railroad was a taking for a public use within the meaning of article I, section 18. *Stewart v. Bd. of Supervisors*, 30 Iowa 9, 19–21 (1870). We said this proposition was "elementary and unquestionable." *Id.* at 21. We quoted with approval "the leading American case," where it was written:

> The right of *eminent domain* does not, however, imply a right in the sovereign power to take the property of one citizen and transfer it to another, even for a full compensation, *where the public interest will be in no way promoted by such transfer.* But if the *public interest can be in any way* promoted by the taking of private property, *it must rest in the wisdom of the legislature*, to determine whether the benefit to the public will be of sufficient importance to render it expedient for them to exercise the right of eminent domain and to interfere with the private rights of individuals for that purpose. . . . *In all such cases* the object of the legislative power is the public benefit derived from the contemplated improvement, whether such improvement is to be effected directly by the agents of the government, or through the medium of *corporate bodies, or of individual enterprise.*

*Id.* (quoting *Beekman v. Saratoga & Schenectady R.R.*, 3 Paige Ch. 45, 73 (N.Y. Ch. 1831)). More recently, in *S.E. Iowa Cooperative Electric Association*, we held that cost savings alone were a sufficient statutory "public use" to justify the construction of a new electrical transmission line. 633 N.W.2d at 820. We explained that "the public is served" when they can "obtain service at a lower cost." *Id.*[5]

---

[5]The 1857 Constitutional Convention turned down language that would have expressly allowed the use of eminent domain for "private roads." 1 *The Debates of the Constitutional Convention of the State of Iowa* 207 (W. Blair Lord rep., 1857), www.statelibraryofiowa.org/services/collections/law-library/iaconst. A private road, though, was defined by a member of the convention as "a way leading from a public highway to a person's dwelling for his convenience merely." *Id.* That is not analogous to the Dakota Access pipeline. Notably, our legislature has long given private property owners the ability to use eminent domain to connect their land-locked lands to existing

In sum, because we do not follow the *Kelo* majority under the Iowa Constitution, we find that trickle-down benefits of economic development are not enough to constitute a public use. To the extent that Dakota Access is relying on the alleged economic development benefits of building and operating the pipeline, we are unmoved. But here there is more. While the pipeline is undeniably intended to return profits to its owners, the record indicates that it also provides public benefits in the form of cheaper and safer transportation of oil, which in a competitive marketplace results in lower prices for petroleum products. As already discussed, the pipeline is a common carrier with the potential to benefit all consumers of petroleum products, including three million Iowans.

The Lamb petitioners assert that even these benefits are not enough, because no Iowa business or consumer will actually use the pipeline to deliver or receive crude oil. This approach is too formalistic. Iowa has some of the most advanced and productive farming in the world. But our economy, including our agricultural economy, depends on other states to produce crude oil and refine that crude oil into petroleum products. If our consideration of public use were limited as the Lamb petitioners propose, it would be very difficult ever to build a pipeline across Iowa carrying any product that isn't produced in Iowa. Yet Iowa is crisscrossed with pipelines.[6]

In *Enbridge Energy (Illinois), L.L.C. v. Kuerth*, the Illinois Appellate Court took a more nuanced view, which we find persuasive. 99 N.E.3d

---

public roads so long as the resulting road is open to the public, *see* Iowa Code § 6A.4(2), and we have upheld the constitutionality of that legislation. *See In re Luloff*, 512 N.W.2d 267, 273–74 (Iowa 1994).

[6]As we have previously noted, the Dakota Access pipeline is intended to replace transportation of crude oil through Iowa by rail. If those railroads are a valid public use, then why would a pipeline not be a public use when it serves the same function?

210, 218 (Ill. App. Ct. 2018). There the court rejected an appeal by certain landowners and upheld a grant of eminent domain authority for an oil pipeline project. *Id.* at 213–14, 218. The court reasoned, "The fundamental flaw of landowners' argument is that they focus entirely upon who *uses* the pipeline rather than who *benefits* from it." *Id.* at 218. The court added,

> Oil, natural gas, and other energy sources are essential to modern American life and must be transported from production facilities to refineries and ultimately to consumers. Pipelines are necessary for this transportation and are often safer and more efficient than transportation by train or truck.

*Id.* Further, the court noted, "[T]he public use requirement can still be met even if the public does not have the right to enter or use the condemned property." *Id.* The court went on,

> In this case, despite landowners' arguments to the contrary, the trial court was not required to examine who would be using the pipeline, the extent of any particular company's use of the pipeline, whether those companies were part of the public, or who would financially benefit from the proposed pipeline. This is because the legislature has determined that pipelines are in the public interest and that it is efficient for private companies, rather than the government, to construct and maintain these pipelines. . . .
>
> . . . .
>
> [T]he only evidence landowners presented was evidence showing that private companies would own and benefit from a proposed pipeline. However, as we emphasize again, who owns or benefits from a proposed pipeline is not relevant evidence to rebut the applicable presumptions. Because landowners did not introduce any relevant evidence to show that the public, in the aggregate, would not be the primary beneficiary of the pipeline, they utterly failed to meet their burden to rebut the presumptions of public use and necessity.

*Id.* at 220–21 (citations omitted).

This reasoning applies here. The record indicates that the Dakota Access pipeline will lead to "longer-term, reduced prices on refined

products and goods and service dependent on crude oil and refined products."

In a similar vein, the Ohio Court of Appeals confronted and then ultimately rejected the following argument from a landowner:

> She claims the pipeline has no "off ramps" in Ohio, which means 100% of the product will be shipped and consumed outside of Ohio. Ohio will only get an economic benefit, which is insufficient to satisfy public use. Furthermore, there is no indication the propane or butane shipped to Marcus Hook will come back to Ohio for heating or gasoline use. Appellant asserts the benefit to Appellee, a private company, is certain while the benefit to Ohio is speculative. Appellant also argues the intended purpose of allowing private companies to appropriate land when they are a common carrier was to build intrastate energy infrastructure, not to authorize the building of interstate infrastructure or interstate transportation of Ohio's resources.

*Sunoco Pipeline L.P. v. Teter*, 63 N.E.3d 160, 171–72 (Ohio Ct. App. 2016).

Notwithstanding *Norwood*, the court found this argument unpersuasive.

*Id.* at 172–73. It reasoned,

> Appellee is a common carrier, not a megastore or a private enterprise that would only be providing economic benefit to Ohio. The reason the General Assembly gave common carriers a rebuttable presumption is because common carriers, as defined by statute, provide our citizens with necessities such as electricity and water. The products, propane and butane, being transported are used to heat homes and as an additive to gasoline. Propane and butane are also used in the production of many products our society uses every day. Thus, the transportation of propane and butane provides more than economic benefit to Ohio, it provides some of the necessities of life.

*Id.* at 173–74. Oil is, if anything, more of a necessity than the hydrocarbons that were involved in *Sunoco Pipeline*.

The Lamb petitioners rely on *Mountain Valley Pipeline, LLC v. McCurdy*, 793 S.E.2d 850 (W. Va. 2016). There a company sought to build a natural gas pipeline to carry almost exclusively natural gas produced by its own affiliates from West Virginia to a terminus in Virginia. *Id.* at 852.

The West Virginia Supreme Court found that this was not a public use within the meaning of a West Virginia statute. *Id.* at 855, 862–63. The court explained,

> MVP has been unable to identify even a single West Virginia consumer, or a West Virginia natural gas producer who is not affiliated with MVP, who will derive a benefit from MVP's pipeline. . . . MVP is a private company seeking to survey property for the ultimate purpose of exercising the right of eminent domain. . . . In fact, the only benefit to West Virginia that has been asserted by MVP in this appeal is the benefit to producers and shippers of the natural gas that is located in West Virginia. Significantly, however, the owners of that natural gas are affiliates of MVP.

*Id.* at 860–61 (footnotes omitted).

The *Mountain Valley Pipeline* court cited *Bluegrass Pipeline Company, LLC v. Kentuckians United to Restrain Eminent Domain, Inc.* 478 S.W.3d 386 (Ky. Ct. App. 2015). 793 S.E.2d at 862. In *Bluegrass Pipeline*, the Kentucky Court of Appeals concluded that a pipeline transporting natural gas liquids through Kentucky on the way to the Gulf of Mexico was not in "public service" and could not exercise eminent domain. 478 S.W.3d at 388, 391–92. Among other things, the court took note that

> the NGLs in Bluegrass's pipeline are being transported to a facility in the Gulf of Mexico. If these NGLs are not reaching Kentucky consumers, then Bluegrass and its pipeline cannot be said to be in the public service of Kentucky.

*Id.* at 392.

These cases can be distinguished. The West Virginia case involved a private pipeline, not a common carrier. *See Mountain Valley Pipeline*, 793 S.E.2d at 860–61. The Kentucky case turned in part on the court's view that "the legislature only intended to delegate the state's power of eminent domain to those pipeline companies that are, or will be, regulated by the [Kentucky Public Service Commission]." *Bluegrass Pipeline Co.*, 478 S.W.3d at 392. But more importantly, we have a different view of "public

use" under the Iowa Constitution. We do not believe a common carrier of a raw material that is essential to Iowa's economy but isn't produced or processed in Iowa is prohibited from exercising eminent domain when so authorized by the general assembly. The public use concept is not that restrictive. *See Transcon. Gas Pipe Line Corp. v. Calco Enters.*, 511 S.E.2d 671, 676 (N.C. Ct. App. 1999) ("The concept is flexible and adaptable to changes in society and governmental duty."). The Iowa Constitution does not hang on the presence of spigots and on-ramps.

Accordingly, we hold that there was no violation of article I, section 18 of the Iowa Constitution. For the reasons already stated, we also find no Fifth Amendment violation. We recognize that a serious and warranted concern about climate change underlies some of the opposition to the Dakota Access pipeline. Maybe, as a matter of policy, a broad-based carbon tax that forced all players in the marketplace to bear the true cost of their carbon emissions should be imposed. The revenues from this broad-based tax could be used to offset other taxes. But policy making is not our function, and as a legal matter we are satisfied that the Dakota Access pipeline meets the characteristics of a public use under the Iowa and United States Constitutions.

**VIII.  Puntenney's and Johnson's Individual Claims.**

Puntenney lives in Boone and owns farmland in Webster County, which is used for growing soybeans and corn. Before the IUB, Puntenney submitted a map showing that the pipeline route was going to cut through the very southwest corner of his property and that it could be rerouted, without becoming any less "straight," so as not to go through his property. Puntenney contends the pipeline should have been rerouted around his property, especially in light of his plans to install wind turbines.

The record shows that the pipeline generally runs on a straight line from northwest Iowa to southeast Iowa but is not entirely straight because of the software employed by Dakota Access to account for environmental features (such as critical habitat, fault lines, state parks, national forests, and historic sites), engineering considerations (such as existing pipelines and power lines), and land use considerations (such as homes, other buildings, dams, airports, cemeteries, and schools).

Puntenney contends that by not requiring Dakota Access to go around his property, the IUB violated Iowa Code section 479B.1, which only confers "rights of eminent domain *where necessary.*" (Emphasis added). According to Puntenney, it was not necessary for the pipeline to traverse his property.

We do not read the statute that way. Obviously, with a pipeline that bisects the entire state, it is never going to be strictly "necessary" for that pipeline to cut across *any particular landowner's property.* Diversions will always be possible. In our view, the demands of this statute are met if the pipeline company demonstrates that the pipeline requires the exercise of eminent domain and demonstrates why the particular route it has proposed is superior. Both criteria were met here. *See Green v. Wilderness Ridge, L.L.C.*, 777 N.W.2d 699, 704 (Iowa 2010) (deciding in a private condemnation action that the legislature intended a flexible approach and that "it is unlikely that the legislature intended to mandate that the land to be condemned must always be the shortest route").

Puntenney also contends the IUB acted arbitrarily in not relocating the proposed pipeline to accommodate his plans to install wind turbines, even as it directed a rerouting for the benefit of a turkey farmer. But the IUB explained why. The turkey farmer was further along. He was talking turkey about putting up new buildings. Puntenney, on the other hand,

had merely conceived the idea of installing wind turbines and had no specific plan. Moreover, the record did not show that the pipeline would interfere with any later plans to erect wind turbines, especially when it only ran under the very southwest corner of Puntenney's property.[7]

Lastly, Puntenney contends that he was not allowed to testify to his concerns about the impact of the pipeline on his drainage tile. However, Puntenney was allowed to file written objections that detailed his tiling concerns. He was also asked specifically about tiling in his live testimony. And he was asked open-ended questions in his live testimony. For example, the chairperson of the IUB asked Puntenney, "Can you tell the Board exactly what you're looking for in terms of relief beyond moving the pipeline off of your property?" Puntenney did not request the chance to testify further.

Johnson is a corn and soybean farmer in Boone County, who like Puntenney sought the rerouting of the pipeline to avoid his property. Johnson said he feared the pipeline would destroy the drainage tile and concrete pipe he had installed on his land. The IUB did not order rerouting, but it did grant relief to Johnson: it directed Dakota Access to install the pipeline below Johnson's entire drainage system, including the twenty-four-inch concrete main that was already buried up to twenty-two feet deep. A Dakota Access witness explained that it would not be feasible to divert the line as Johnson had requested because in the area of proposed diversion there were a forest, a creek, and a county drain line. Dakota Access would have to cut out trees, cross a creek, and encumber another drain line. The IUB concluded, "[T]here appears to be no

_____

[7]Puntenney also compares his situation to that of another landowner who was granted relief. But that landowner was only granted partial relief. Dakota Access was directed to negotiate with that landowner to avoid one parcel that it had conceded it could avoid and to relocate the route over three other parcels (without avoiding them entirely).

reasonable alternative to granting eminent domain along the route proposed by Dakota Access and boring under the 24-inch main appears to be the least intrusive alternative." This finding is supported by substantial evidence.

### IX. Conclusion.

For the foregoing reasons, we affirm the judgment of the district court.

**AFFIRMED.**

All justices concur except Wiggins, J., who concurs in part and dissents in part, joined by Appel, J., and McDonald, J., who dissents.

**WIGGINS, Justice (concurring in part and dissenting in part).**

I dissent from the majority's conclusion that the use of eminent domain does not violate the Iowa Constitution. I agree with the majority that incidental economic benefits alone are not enough for a taking to qualify as "for public use" under article I, section 18. However, I disagree that the Dakota Access pipeline fits within the "common carrier exception" for purposes of the Iowa Constitution. I also find fault in Dakota Access's use of eminent domain because it is unrelated to the purpose of the applicable eminent-domain-authorizing statute.

One way a taking complies with article I, section 18's public use requirement is where "the sovereign . . . transfer[s] private property to private parties, often common carries, who make the property available for the public's use." *Kelo v. City of New London*, 545 U.S. 469, 497–98, 125 S. Ct. 2655, 2673 (2005) (O'Connor, J., dissenting). Inherent in this "use-by-the-public" method of compliance is that the condemning sovereign's public be able to use the taken property. Various courts have recognized that

> [t]he sovereign's power of eminent domain, whether exercised by it or delegated to another, is limited to the sphere of its control and within the jurisdiction of the sovereign. A state's power exists only within its territorial limits for the use and benefit of the people within the state. Thus, property in one state cannot be condemned for the sole purpose of serving a public use in another state.

*Mountain Valley Pipeline, LLC v. McCurdy*, 793 S.E.2d 850, 862 (W. Va. 2016) (quoting *Clark v. Gulf Power Co.*, 198 So. 2d 368, 371 (Fla. Dist. Ct. App. 1967)); *accord, e.g.*, *Adams v. Greenwich Water Co.*, 83 A.2d 177, 182 (Conn. 1951) (noting "no state is permitted to exercise or authorize the exercise of the power of eminent domain except for a public use within its

own borders" and collecting cases); *Square Butte Elec. Coop. v. Hilken*, 244 N.W.2d 519, 525 (N.D. 1976) ("[A]lthough other states may also be benefited, the public in the state which authorizes the taking must derive a substantial and direct benefit . . . , something greater than an indirect advantage . . . ."); *see Gralapp v. Miss. Power Co.*, 194 So. 2d 527, 531 (Ala. 1967).

Recently, other states have relied on that principle when considering whether a pipeline running across the state constituted a public use. *See Mountain Valley Pipeline*, 793 S.E.2d at 860–62 (West Virginia high court finding a natural gas pipeline was not for a public use because *West Virginians* could not use and did not directly benefit from the pipeline or the natural gas it was to transport); *see also Bluegrass Pipeline Co. v. Kentuckians United to Restrain Eminent Domain, Inc.*, 478 S.W.3d 386, 392 (Ky. Ct. App. 2015) (finding pipeline was not "in the public service of Kentucky" because the product in the pipeline was being transported to a facility in the Gulf of Mexico and not reaching Kentucky consumers); *cf. In re Condemnation by Sunoco Pipeline, L.P.*, 143 A.3d 1000, 1019 (Pa. Commw. Ct. 2016) (upholding finding of public benefit of pipeline because the *intrastate* pipeline would enhance delivery options for natural gas and liquids *in Pennsylvania*).

Additionally, I would find Dakota Access's takings do not qualify as "for public use" because the primary purposes of the takings and their incidental economic and public safety benefits are unrelated to the purpose of the statute authorizing the use of eminent domain.

In this case, the statute authorizing the use of eminent domain is not Iowa Code chapter 6A but rather chapter 479B. The purpose of chapter 479B is "to protect landowners and tenants from environmental or economic damages which may result from the construction, operation,

or maintenance of a hazardous liquid pipeline." Iowa Code § 479B.1 (2016).

The primary purported purposes of Dakota Access's pipeline are (1) so a private business can build a private pipeline to "transport crude oil from sources in North Dakota to a hub in Illinois" and (2) to answer the oil industry's desire for a pipeline. However, the purpose of chapter 479B is neither to facilitate private transportation of crude oil (or other hazardous liquids) nor to acquiesce to a particular industry's desire for a particular method of transporting its product. Thus, the primary purported purposes of the pipeline are unrelated to the purpose of exercising eminent domain as contemplated in chapter 479B.

Likewise, the Iowa Utility Board's (IUB) finding that the pipeline promotes public safety does not correspond with the purpose of chapter 479B. The IUB found the pipeline promotes public safety because the risk of an oil spill is lower when the oil is transported by pipeline than when it is transported by rail. But the public safety purpose of chapter 479B is not to lower the risk of damages resulting from the transportation of oil generally. It is to protect against damages resulting "from the construction, operation, or maintenance" of an oil pipeline. *Id.*

In sum, I conclude the Dakota Access pipeline does not fit within the common carrier exception for purposes of the Iowa Constitution because the Iowa public cannot use and does not derive a direct benefit from it. Further, even taking into account the purported incidental and secondary benefits to Iowans, the use of eminent domain in this case does not accord with the purpose for which eminent domain may be exercised as stated in the pertinent statute authorizing the use of eminent domain. I would hold the Dakota Access's takings violate article I, section 18 of the Iowa Constitution.

Appel, J., joins this concurrence in part and dissent in part.

**McDONALD, Justice (dissenting).**

The Iowa Utilities Board (IUB) approved construction of the pipeline. The IUB authorized Dakota Access to use the eminent domain power to condemn easements. Dakota Access exercised the eminent domain power as granted. The appellants accepted the condemnation awards. Dakota Access built the pipeline. Oil is flowing through the pipeline. No further relief is available. What's done, is done. The case is moot.

The leading case is *Welton v. Iowa State Highway Commission*, 208 Iowa 1401, 227 N.W. 332 (1929). In *Welton*, we concluded a challenge to the construction of a highway was moot when construction was completed:

> [S]ubsequent to the decision of the district court in this case, and in the absence of an order staying appellees' actions, the road in controversy was established . . . [. T]he appellant has perfected an appeal to the district court of Mahaska county, from the award of the condemnation commissioners, as to the amount of his damages . . . . [D]uring the pendency of the appeal, the defendant did not obtain a restraining order from this court . . . .
>
> It is apparent from the uncontroverted affidavit that the orchard has been taken for highway purposes and the paving laid. No order which we can now make can preserve to appellant his orchard.

*Id.* at 1402–03, 227 N.W. at 333.

Similarly, in *Porter v. Board of Supervisors*, we concluded the completion of a drainage ditch was an established fact that precluded relief:

> We call attention also to the fact . . . that the construction ha[s] already taken place and that the canal or ditch [i]s in operation. There was no stay of proceedings nor application in this court for an order to stay construction. Under these circumstances the construction of the ditch became an established fact before the case was submitted to us for decision.

238 Iowa 1399, 1404, 228 N.W.2d 841, 844 (1947).

As in *Welton* and *Porter*, the construction and operation of the pipeline is an established fact—what's done cannot be undone. The appellants previously conceded their claims were moot once the pipeline was completed and placed into service. In the district court, the appellants sought a stay. In support of their application for stay, the appellants conceded "if they d[id] not receive a stay before [Dakota Access's] pipeline trench [wa]s dug, any remedy w[ould] be inadequate." The district court denied the application for stay. The appellants did not seek interlocutory appeal, did not seek a stay from this court, and did not seek to expedite the appeal. In the meantime, the "trench [was] actually dug."

The completion of the pipeline and the appellants' acceptance of the condemnation awards are established facts that render their claim moot. *See Campbell-Ewald Co. v. Gomez,* 577 U.S. ___, ___, 136 S. Ct. 663, 669 (2016) ("If an intervening circumstance deprives the plaintiff of a 'personal stake in the outcome of the lawsuit,' at any point during litigation, the action can no longer proceed and must be dismissed as moot." (quoting *Genesis Healthcare Corp. v. Symczyk,* 569 U.S. 66, 72, 133 S. Ct. 1523, 1528 (2013))); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 301 F. Supp. 3d 50, 63 (D.D.C. 2018) ("The specter of mootness raised in Standing Rock's earlier filings has now come to pass—construction is complete and oil is flowing through the pipeline."); *Gunnar v. Town of Montezuma,* 228 Iowa 581, 584, 293 N.W. 1, 3 (1940) (stating a case is moot if "the threatened action has become an accomplished fact"). For these reasons, I would dismiss the appeal.